2000 ME 198

**Rose RIDEOUT et al.**

v.

**Heaven RIENDEAU et al.**

Supreme Judicial Court of Maine.

Argued June 5, 2000.

Decided Nov. 13, 2000.

Joseph M. Baldacci (orally), Bangor, for plaintiffs.

Jed J. French (orally), Frances Crary Lindemann, Powers & French, P.A., Freeport, for defendants.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, and ALEXANDER, JJ.

SAUFLEY, J.

[¶ 1] We are called upon here to determine whether Maine's Grandparents Visitation Act violates the constitutional rights of competent parents who choose not to have their children visit with their grandparents. We conclude that the Act, as applied to the facts presented to us, is narrowly tailored to serve a compelling state interest, and thus does not violate the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

[¶ 2] The grandparents before us, Rose and Chesley Rideout, appeal from a judgment entered in the Superior Court (Sagadahoc County, *Humphrey, J.*) affirming an order of the District Court (West Bath, *Field, J.*) dismissing their petition for visitation with their grandchildren. The District Court held that the Grandparents Visitation Act, 19–A M.R.S.A. §§ 1801–1805 (1998), violates the Fourteenth Amendment of the U.S. Constitution because it does not require a showing of harm to the child before a court can order visitation with a grandparent.[1] The court concluded that the "best interest of the child standing by itself is not a compelling state interest." We do not disagree with that conclusion. We conclude, however, that the state does have a compelling interest in providing a forum within which grandparents who have acted as parents to their grandchild may seek continued contact with that child. Thus, we vacate the judgment dismissing the Rideouts' visitation petition and remand for an application of the Act after a new hearing.

## I. BACKGROUND

[¶ 3] The underlying procedural and historical facts may be summarized as follows.[2] Rose and Chesley Rideout wish to visit with their three grandchildren. The parents of the children do not currently want their children to spend time with the Rideouts. All three children live with their parents, Heaven–Marie Riendeau and Jeffrey Riendeau. Heaven–Marie is the daughter of the Rideouts. The children are Keiko–Marie, now 13 years old

---

1. The District Court originally found that 19 M.R.S.A. §§ 1001–1004 (Supp.1995–96) was unconstitutional. This statute was repealed and replaced by 19–A M.R.S.A. §§ 1801–1805 (1998). The Superior Court remanded the case to the District Court for a determination of whether the recodification affected its legal analysis. The District Court found no change in the revised Grandparents Visitation Act that would alter its decision, and thus, we review the Act as it exists today.

2. The trial court's judgment contains substantial findings of fact which the parties do not dispute. Our recitation of the facts is drawn from those findings.

(born February 6, 1987); Roman, now 11 years old (born February 16, 1989); and, Mariah, now 7 years old (born June 10, 1993). Jeffrey is the biological father of Mariah and the adoptive father of Roman.

[¶ 4] Heaven was a sixteen-year-old high school student, unmarried, and living at home with the Rideouts when she gave birth to Keiko. During the first seven years of Keiko's life, four years of Roman's life, and several months of Mariah's life, the Rideouts were the children's "primary caregivers and custodians." In Keiko's early years, Rose's significant involvement in caring for Keiko upset Heaven and caused friction between Heaven and Rose. On several occasions, Heaven left Keiko in the sole custody of Rose and signed written powers of attorney for Rose to act as Keiko's legal guardian. Heaven moved first to Massachusetts and then to Bangor for Job Corps training. After she completed her training in 1989, Heaven moved in with her then-husband, Joseph Henderson, and their newborn son, Roman. At Rose's urging, Keiko went to live with her mother and her stepfather. Soon, however, Henderson became violent and abusive, and Heaven and her two children returned to live with the Rideouts.

[¶ 5] In June 1992, Heaven and Jeffrey Riendeau married. Approximately one year later, and about the time of Mariah's birth, Heaven and Jeffrey separated, "primarily because of the tensions caused by Rose's interference in their family unit." At this point, Heaven and the three children again went to live with the Rideouts. Despite returning to live with-her parents, Heaven's relationship with Rose remained strained. After Heaven moved back in with her parents, Rose contacted the Department of Human Services regarding

Heaven and Jeffrey's care of the children. Additionally, Rose filed a petition seeking to adopt Keiko. Heaven and the three children left the Rideouts' home near the time Rose contacted the authorities, and Heaven terminated all contact between grandparents and grandchildren after returning to live with Jeffrey. From this point forward, Heaven and Jeffrey appear to have enjoyed a stable home life. The Rideouts filed the instant complaint seeking court-ordered visitation pursuant to the Grandparents Visitation Act, and the parents moved to dismiss on the ground that the Act is unconstitutional.

[¶ 6] The District Court held a combined hearing on the merits and the motion to dismiss. Although the court granted the motion to dismiss, it also undertook to find the facts, and in so doing, determined that the Rideouts had met the statutory criteria and would be entitled to visitation pursuant to the terms of the Act if the Act were constitutional. The court, however, ordered no visitation, concluding that the Act violated the Due Process Clause of the Fourteenth Amendment.[3] The grandparents appealed to the Superior Court without success and now bring their appeal before us.[4]

## II. DISCUSSION

### A. *Troxel v. Granville*

[¶ 7] No analysis of Maine's Grandparents Visitation Act can be undertaken without a review of the recent decision of the U.S. Supreme Court in *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).

[¶ 8] In *Troxel*, the Court was called upon to review the constitutionality of the

---

3. Neither party made an argument concerning the applicability of the Maine Constitution to the constitutional validity of the Act, and therefore, we do not address this issue on appeal. *Berg v. Bragdon*, 1997 ME 129, ¶ 9, 695 A.2d 1212, 1214 (holding that an issue is waived if it is not raised or preserved by the parties). *See* ME. CONST. art. I, § 6–A.

4. Part of the inordinate delay in the Superior Court was occasioned by a failure to comply with the briefing schedule and by a remand to permit the District Court to determine whether a recodification of the Act impacted its legal analysis. *See* P.L.1995, ch. 694, § B–2 (effective date October 1, 1997).

State of Washington's version of a nonparent visitation statute. *Troxel*, 530 U.S. at ——, 120 S.Ct. at 2057. The Washington statute is significantly broader than the Maine Act. *See* WASH. REV. CODE ANN. § 26.10.160(3) (West 1998). The Washington Supreme Court struck down its statute on the basis of the U.S. Constitution, holding that the statute unconstitutionally infringed on the fundamental right of parents to rear their children. *Troxel*, 530 U.S. at ——, 120 S.Ct. at 2057. In so holding, the Washington Supreme Court reasoned that the statute required "no threshold showing of harm" and that it allowed " 'any person' to petition for forced visitation of a child at 'any time' with the only requirement being that the visitation serve the best interest of the child." [5] *Id.* 530 U.S. at ——, 120 S.Ct. at 2058–59 (citations omitted). The contrast of Maine's more tailored Act, which applies only to grandparents and provides a number of protections for parents, is highlighted by Justice O'Connor's description of the Washington statute as one that "effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review." *Id.* 530 U.S. at ——, 120 S.Ct. at 2061.[6]

[¶ 9] Writing for a plurality of the Court, Justice O'Connor found the Washington statute unconstitutional. *Id.* 530 U.S. at ——, 120 S.Ct. at 2065. The plurality found it pivotal that the Washington statute entirely eliminated the parents from the decision-making process, noting that "[o]nce the visitation petition has been filed in court and the matter is placed before a judge, a parent's decision that visitation would not be in the child's best interest is accorded *no deference.*" *Id.* 530 U.S. at ——, 120 S.Ct. at 2061 (emphasis added). Indeed, the Washington statute "contains no requirement that a court accord the parent's decision any presumption of validity or *any weight whatsoever.*" *Id.* (emphasis added). Concluding that the "Due Process Clause does not permit a State to infringe on the fundamental right of parents to make childrearing decisions simply because a state judge believes a 'better' decision could be made," the Court declared the Washington statute unconstitutional as applied. *Id.* 530 U.S. at ——, 120 S.Ct. at 2064.

[¶ 10] Although the *Troxel* plurality found the Washington statute to be unconstitutional because it was "breathtakingly broad," it was careful not to decide matters beyond those that were before it. *Id.* 530 U.S. at ——, ——, 120 S.Ct. at 2061, 2064. The plurality noted that "[b]ecause much state-court adjudication in this context occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a per se matter." *Id.* at 2064 (citations omitted). Moreover, given the "sweeping breadth" of the Washington statute, the *Troxel* plurality was not called upon to engage in a strict scrutiny of the statute. *Id.* Under no level of scrutiny would the Washington statute be

---

5. The best interests of the child standard has at times been criticized as indeterminate, leading to unpredictable results. As one judge has observed:

> What is best for children depends upon values and norms upon which reasonable people differ. Broad room for debate means a broad and unpredictable array of possible outcomes in any custody contest. That fact encourages prolonged and expensive litigation and "strategic behaviors" of the parents, neither of which usually benefits children.

Honorable John C. Sheldon, *Anticipating the American Law Institute's Principles of the Law of Family Dissolution,* 14 ME. B.J. 18, 25 (1999) (citations omitted).

6. In addition to a significantly different statutory framework, the facts at issue in *Troxel* were very different from those before us. The *Troxel* Court was faced with a parent who had *agreed* to allow the grandparents, the parents of her deceased husband, to visit with her children. *Troxel v. Granville,* 530 U.S. ——, ——–——, 120 S.Ct. 2054, 2061–63, 147 L.Ed.2d 49 (2000). The paternal grandparents filed a visitation petition "soon after the death [by suicide] of their son." *Id.* 530 U.S. at ——, 120 S.Ct. at 2061.

deemed consistent with the concepts embodied in the Due Process Clause.[7]

[¶ 11] Thus, although the *Troxel* Court declared the Washington statute unconstitutional, it did so on the limited facts and law before it, leaving for another day a constitutional analysis of statutes with more carefully established protections of parents' fundamental rights.

▮▮▮▮ [¶ 12] The *Troxel* opinion does, however, provide us with clear guidance on important points. First,

> The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.

*Id.* 530 U.S. at ——, 120 S.Ct. at 2060. The fundamental right of parents to direct the care and upbringing of their children does not disappear in the face of a third party's request for visitation with the children. Second, the best interests of the child standard, standing alone, is an insufficient standard for determining when the State may intervene in the decision making of competent parents. *Id.* 530 U.S. at ——, 120 S.Ct. at 2061. And finally, because of the "presumption that fit parents act in the best interests of their children,"

trial courts must accord special weight to parents' decisions and objections regarding requests for third-party visitation. *Id.* 530 U.S. at —— – ——, 120 S.Ct. at 2061–62.[8]

[¶ 13] With these principles in mind, we turn to our analysis of the Maine Grandparents Visitation Act.

### B. Standard of Review

▮▮▮▮ [¶ 14] The constitutionality of the Grandparents Visitation Act presents a question of first impression in Maine.[9] Because the District Court ruled on the validity of the Act as a matter of law, we review the court's decision de novo, *Estate of Jacobs*, 1998 ME 233, ¶ 4, 719 A.2d 523, 524, and we accord no special deference to the review conducted in the Superior Court. *Pepperman v. Town of Rangeley*, 1999 ME 157, ¶ 3, 739 A.2d 851, 852. Our review is guided by the familiar principle that "[a] statute is presumed to be constitutional and the person challenging the constitutionality has the burden of establishing its infirmity." *Kenny v. Dep't of Human Servs.*, 1999 ME 158, ¶ 7, 740 A.2d 560, 563 (citation omitted). Because we must assume that the Legislature acted in accord with due process requirements, if we can reasonably interpret a statute as satisfying those constitutional requirements, we must read it in such a way,

---

7. The plurality opinion and Justices Thomas and Stevens expressly recognized that parents have a "fundamental right" to the care and custody of their children. *Troxel*, 530 U.S. at ——, ——, 120 S.Ct. at 2060, 2068 (Thomas, J., concurring), 530 U.S. at ——, 120 S.Ct. at 2071 (Stevens, J., dissenting). In recognition of this "fundamental right," Justice Thomas opined that the statute could not survive analysis in accordance with the strict scrutiny standard of review. *Id.* 530 U.S. at ——, 120 S.Ct. at 2068 (Thomas, J., concurring). Justices Souter and Kennedy recognized that parents have a constitutional right protected by the Due Process Clause. *Id.* 530 U.S. at ——, 120 S.Ct. at 2066 (Souter, J., concurring), 530 U.S. at ——, 120 S.Ct. at 2076 (Kennedy, J., dissenting). Justice Souter voted to affirm on the basis that the statute "sweeps too broadly and is unconstitutional

on its face." *Id.* 530 U.S. at ——, 120 S.Ct. at 2066 (Souter, J., concurring).

8. We think it also significant that the *Troxel* Court gave particular notice to the expansive reading of the statute by the Washington Supreme Court, noting that the "Washington Supreme Court had the opportunity to give [the statute] a narrower reading, but it declined to do so." *Troxel*, 530 U.S. at ——, 120 S.Ct. at 2061 (citation omitted). In recognition of the rapidly changing face of Maine families, we proceed with caution in this developing area of family law and refrain from announcing sweeping statements of constitutionality.

9. Although the Act's constitutionality has been previously argued to us, we declined to consider that claim because it was not properly preserved for review. *Berg*, 1997 ME 129, ¶ 10, 695 A.2d at 1215.

notwithstanding other possible unconstitutional interpretations of the same statute. *Portland Pipe Line Corp. v. Envtl. Improvement Comm'n*, 307 A.2d 1, 15–16 (Me.1973).

■ [¶ 15] Our role in reviewing the constitutionality of a statute must necessarily be limited by the facts in the case before us. We may not reach beyond those facts to decide the constitutionality of matters not yet presented. *United States v. Raines*, 362 U.S. 17, 21–22, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960); *State v. Gray*, 440 A.2d 1062, 1064 (Me.1982). We agree with the wisdom of Justice Brennan, writing for the unanimous Court in *Raines*, in which he concluded that an appellate court must be bound by two rules: "one, never ... anticipate a question of constitutional law in advance of the necessity of deciding it; the other, never ... formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Raines*, 362 U.S. at 21, 80 S.Ct. 519 (citation omitted). Hence, we address the constitutionality of the Act before us in the context of the facts found by the District Court.

## C. The Act

[¶ 16] The Grandparents Visitation Act was enacted to provide a forum where certain grandparents could seek access to their grandchildren.[10] The Act provides

10. Section 1803 reads as follows in its entirety:

> § 1803. Petition
> 1. **Standing to petition for visitation rights.** A grandparent of a minor child may petition the court for reasonable rights of visitation or access if:
>   A. At least one of the child's parents or legal guardians has died;
>   B. There is a sufficient existing relationship between the grandparent and the child; or
>   C. When a sufficient existing relationship between the grandparent and the child does not exist, a sufficient effort to establish one has been made.
> 2. **Procedure.** The following procedures apply to petitions for rights of visitation or access under subsection 1, paragraph B or C.
>   A. The grandparent must file with the petition for rights of visitation or access an affidavit alleging a sufficient existing relationship with the child, or that sufficient efforts have been made to establish a relationship with the child. When the petition and accompanying affidavit are filed with the court, the grandparent shall serve a copy of both on at least one of the parents or legal guardians of the child.
>   B. The parent or legal guardian of the child may file an affidavit in response to the grandparent's petition and accompanying affidavit. When the affidavit in response is filed with the court, the parent or legal guardian shall deliver a copy to the grandparent.
>   C. The court shall determine on the basis of the petition and the affidavit whether it is more likely than not that there is a sufficient existing relationship or, if a sufficient relationship does not exist, that a sufficient effort to establish one has been made.
>   D. If the court's determination under paragraph C is in the affirmative, the court shall hold a hearing on the grandparent's petition for reasonable rights of visitation or access and shall consider any objections the parents or legal guardians may have concerning the award of rights of visitation or access to the grandparent. The standard for the award of reasonable rights of visitation or access is provided in subsection 3.
> 3. **Best interest of the child.** The court may grant a grandparent reasonable rights of visitation or access to a minor child upon finding that rights of visitation or access are in the best interest of the child and would not significantly interfere with any parent-child relationship or with the parent's rightful authority over the child. In applying this standard, the court shall consider the following factors:
>   A. The age of the child;
>   B. The relationship of the child with the child's grandparents, including the amount of previous contact;
>   C. The preference of the child, if old enough to express a meaningful preference;
>   D. The duration and adequacy of the child's current living arrangements and the desirability of maintaining continuity;
>   E. The stability of any proposed living arrangements for the child;
>   F. The motivation of the parties involved and their capacities to give the child love, affection and guidance;
>   G. The child's adjustment to the child's present home, school and community;

that grandparents will have standing to bring a petition for visitation only if they demonstrate (1) the death of one of the parents; (2) a "sufficient existing relationship" with their grandchildren; or (3) a sufficient effort to sustain a relationship. 19–A M.R.S.A. § 1803(1) (1998).

[¶ 17] Only subsection 1803(1)(B) of the Act is before us, and we have no occasion to consider the remaining prongs.[11] Thus, we do not address the constitutionality of subsections 1803(1)(A) or 1803(1)(C); we determine only whether subsection 1803(1)(B), requiring a "sufficient existing relationship between the grandparent and the child," can be applied in a manner consistent with the Due Process Clause.

D. Constitutionality of the "Sufficient Existing Relationship" Provision

[¶ 18] We begin our analysis by recognizing that parents have a fundamental liberty interest "to make decisions concerning the care, custody, and control of their children." *Troxel*, 530 U.S. at ——, 120 S.Ct. at 2060 (citations omitted). In other words, the right to *direct and control* a child's upbringing is a "fundamental" liberty interest protected by the Due Process Clause. *Id.* We understand this fundamental right to be firmly established.[12] "Accordingly, so long as a parent adequately cares for his or her children (i.e., is fit), there will *normally* be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Id.* 530 U.S. at ——, 120 S.Ct. at 2061 (citing *Reno v. Flores*, 507 U.S. 292, 304, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993)) (emphasis added).

[¶ 19] The constitutional liberty interest in family integrity is not, however, absolute, nor forever free from state interference. *Wisconsin v. Yoder*, 406 U.S. 205, 233–34, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *McNicholas v. Bickford*, 612 A.2d 866, 870 (Me.1992). The Due Process Clause is not an impenetrable wall behind which parents may shield their children; rather, it provides heightened protection against state intervention in parents' fundamental right to make decisions concerning the care, custody, and control of their children. *See Parham v. J.R.*, 442 U.S. 584, 603–05, 99 S.Ct. 2493, 61 L.Ed.2d 101

H. The capacity of the parent and grandparent to cooperate or to learn to cooperate in child care;
I. Methods of assisting cooperation and resolving disputes and each person's willingness to use those methods; and
J. Any other factor having a reasonable bearing on the physical and psychological well-being of the child.
4. **Modification or termination.** The court may modify or terminate any rights granted under this section as circumstances require. Modification or termination of rights must be consistent with this section.
5. **Enforcement.** The court may issue any orders necessary to enforce orders issued under this section or to protect the rights of parties.
6. **Costs and fees.** The court may award costs, including reasonable attorney's fees, for defending or prosecuting actions under this chapter.
19–A M.R.S.A. § 1803 (1998).

11. Although Keiko and Roman both spent years in the care of the Rideouts, their sister Mariah has spent very little time with her grandparents. The parties have stipulated, however, that the children are very close and should be treated identically for purposes of the Act. Therefore, all three of the children are treated as if they have the same "sufficient existing relationship" with their grandparents.

12. *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (stating that the liberty of parents includes the right to direct the upbringing of their children), *Meyer v. Nebraska*, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (holding that the liberty protected under the Due Process Clause includes the right of parents to direct the upbringing and control the education of their children). *See, e.g., Osier v. Osier*, 410 A.2d 1027, 1029 (Me.1980) (recognizing parents' "fundamental right" to the "care and custody" of their children); *Danforth v. State Dep't of Health & Welfare*, 303 A.2d 794, 797 (Me.1973) (discussing the natural and fundamental rights of parents to the custody of their children).

(1979). That heightened protection mandates strict scrutiny of the statute at issue. *See Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Sch. Admin. Dist. No. 1 v. Comm'r, Dep't of Educ.*, 659 A.2d 854, 857 (Me.1995). Strict scrutiny requires that the State's action be narrowly tailored to serve a compelling state interest. *Flores*, 507 U.S. at 301–02, 113 S.Ct. 1439; *Butler v. Supreme Judicial Court*, 611 A.2d 987, 992 (Me.1992).

[¶ 20] Therefore, because a fundamental liberty interest is unquestionably at stake here, we must determine first, whether that fundamental liberty interest is interfered with, *by the State,* in the context of the Grandparents Visitation Act. If so, we apply strict scrutiny to the portions of the Act before us to determine whether the State has narrowly tailored its involvement in the family to serve a compelling state interest.

### (i) State Intervention in a Fundamental Right

■ [¶ 21] We conclude, and no party has challenged, that the Grandparents Visitation Act provides a mechanism by which the State may intervene in the basic exercise of parents' rights to determine the care and custody of their children. The Act allows the courts to determine whether parents will be required to turn their children over to the grandparents against the parents' wishes. The power of the court to adjudicate such disputes and to enforce its own orders constitutes state involvement in a way that clearly implicates parents' fundamental liberty inter-

ests in the care and custody of their children.[13]

### (ii) Compelling State Interest

■ [¶ 22] Because a fundamental liberty interest is interfered with by the State, the State is required to demonstrate that its actions serve a compelling state interest. The District Court, in its thoughtful analysis regarding the necessity of a compelling state interest, noted that "[i]f ... the Act provided a requirement of harm, then it would advance a compelling state interest and pass constitutional muster." Concluding that the absence of a "harm" element eliminated any compelling state interest, the court held the Act to be unconstitutional.

■ [¶ 23] An element of "harm" in the traditional sense is not, however, the only compelling state interest extant when matters relating to the welfare of children are under scrutiny. For example, the State's compelling interest in requiring school attendance or restricting child labor does not derive exclusively from the State's interest in preventing "harm," but instead stems from the State's broader *parens patriae* interest in the well-being of children. *See Prince v. Massachusetts*, 321 U.S. 158, 166–67, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *see also In re Sarah T.*, 629 A.2d 53, 55 (Me. 1993) (finding a compelling state interest in achieving timely permanence for abused children). Thus, although the threat of harm to a child is certainly sufficient to provide the State with a compelling interest,[14] harm consisting of a threat to physi-

---

13. *See, e.g., Connecticut v. Doehr*, 501 U.S. 1, 10–11, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991) (noting that prejudgment remedy statutes enable a party to utilize state procedures with the "overt, significant assistance of state officials," thereby involving state action substantial enough to implicate the Due Process Clause); *see also Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 85, 108 S.Ct. 896, 99 L.Ed.2d 75 (1988); *Lugar v. Edmondson Oil*

*Co., Inc.*, 457 U.S. 922, 941, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

14. The State's authority over parental decisions is well established in certain areas, such as health requirements, including immunization needs, 20–A M.R.S.A. § 6354 (1993), education requirements, including a qualified schooling plan, 20–A M.R.S.A. § 5001–A (1993), and safety requirements, addressed in the Child and Family Services and Child Protection Act, 22 M.R.S.A. §§ 4001–4093 (1992

cal safety or imminent danger is not a *sine qua non* for the existence of a compelling state interest. We agree with the trial court, however, that something more than the best interest of the child must be at stake in order to establish a compelling state interest.[15]

▉ [¶ 24] We are not called upon here to define all instances where a compelling interest could be demonstrated by the State. We need only look to the facts before us to determine whether that level of interest exists, and for that determination we are guided by our own language: "The natural right of a parent to the care and control of a child should be limited only for the most *urgent reasons*." *Merchant v. Bussell*, 139 Me. 118, 27 A.2d 816, 818 (1942) (emphasis added).

[¶ 25] We *conclude* that "urgent reasons" exist, where, as here, a grandparent who has functioned as a parent to the child seeks continued contact with that child. The Rideouts acted as Keiko and Roman's parents for many years. Keiko spent so much of her first seven years being parented by her grandparents that she called the Rideouts "Mom and Dad" and referred to her own mother as "her aunt."

[¶ 26] The cessation of contact with a grandparent whom the child views as a parent may have a dramatic, and even traumatic, effect upon the child's well-being. The State, therefore, has an urgent, or compelling, interest in providing a forum for those grandparents having such a "sufficient existing relationship" with their grandchildren. Here the Rideouts have acted as parents for their grandchildren, and therefore may seek continued access to those children. This interest springs not from any common law right of the grandparent to visitation with the child, but from the child's significant need to be assured that he or she will not unnecessarily lose contact with a grandparent who has been a parent to that child.[16] *See*

& Supp.1999). *See, e.g., Jacobson v. Massachusetts*, 197 U.S. 11, 29–30, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (upholding state's compelling interest in compulsory vaccination laws).

15. In fact, the concept that the State may not intervene in family life merely on the basis of a best interest determination is so well established that we have explicitly directed trial courts not to reach the best interest prong in termination of parental rights cases until the State has made a showing of parental unfitness based on one of four statutory bases for termination. *See In re Ashley A.*, 679 A.2d 86, 89 (Me.1996). Unless the court has found the presence of one of those "harm" factors, *it may not even consider* the best interests of the child. *See In re Leona T.*, 609 A.2d 1157, 1158 (Me.1992); *see also Smith v. Org. of Foster Families*, 431 U.S. 816, 862–63, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring) ("If a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest, I should have little doubt that the State would have intruded impermissibly on 'the private realm of family life which the state cannot enter.'" (citation omitted)).

16. Contrary to the assertions of our colleagues in the Concurrence, any "confluence of constitutional rights" cannot include the grandparents as separate holders of such rights. Grandparents simply do not have a general common law or constitutional right of access to their grandchildren. Indeed, it was the lack of any legal authority for securing the court's assistance in obtaining visits between grandparents and their grandchildren that led the Legislature to enact the very statute before us today. "As a general matter ... contemporary state-court decisions acknowledge that '[h]istorically, grandparents had no legal right of visitation.'" *Troxel*, 530 U.S. at ——, 120 S.Ct. at 2077 (Kennedy, J. dissenting) (citation omitted). *Id.* 530 U.S. at ——, 120 S.Ct. at 2061; *Conservatorship of Justin R.*, 662 A.2d 232, 234–35 (Me.1995) (affirming a denial of the grandparent's guardianship petition in the absence of parental unfitness); *Stanley v. Penley*, 142 Me. 78, 46 A.2d 710, 712 (1946) (declining to award custody of children to maternal grandparents when father was fit and present).

Rather, grandparents' rights, if any, stem derivatively from the "recognition ... that *children* should have the opportunity to benefit from relationships with statutorily specified persons—for example, their grandparents." *Troxel*, 530 U.S. at ——, 120 S.Ct. at 2059 (emphasis added). "Because grandparents and other relatives undertake duties of a *parental nature* in many households, States

*Troxel,* 530 U.S. at ——, 120 S.Ct. at 2071 (Stevens, J., dissenting) ("There is at a minimum a third individual, whose interests are implicated in every case to which the statute applies—the child.").

[¶ 27] When a grandparent has been the "primary caregiver and custodian" for a child over a significant period of time, the relationship between the child and the grandparent warrants application of the court's *parens patriae* authority on behalf of the child and provides a compelling basis for the State's intervention into an intact family with fit parents. Recently, this compelling interest has been recognized in several other contexts, based upon the reasoning that a parent's fundamental liberty interest must be balanced against a "[child's] interest in continuing to have access to the only adult who has acted as a parent to [the child]." *Youmans v. Ramos,* 429 Mass. 774, 711 N.E.2d 165, 172 (1999); *see also V.C. v. M.J.B.,* 163 N.J. 200, 748 A.2d 539, 548–49 (2000) (holding that the State may intervene to grant visitation over the objections of a parent where the child's psychological parent "has stepped in to assume the role of the legal parent who has been unable or unwilling to undertake the obligations of parenthood"); American Law Institute, *Principles of the Law of Family Dissolution* § 2.03 (Tentative Draft No. 4, 2000).[17]

[¶ 28] Thus, the State has demonstrated that it has a compelling interest in providing a forum in which a grandparent, who has acted as a parent to the child at issue, may seek continuing contact with the child.

have sought to ensure the *welfare of the children* therein by protecting the relationships those children form with such third parties." *Id.* (emphasis added). Thus, although a grandparent can and should be a positive influence in a child's life, the biological relationship alone does not provide a basis for a legally enforceable interest in a child whose parents are present and fit, *see In re Sterling N.,* 673 A.2d 1312, 1314–15 (Me.1996), and whose relationship with the grandparent is not of a "parental nature," *see Troxel,* 530 U.S. at ——, 120 S.Ct. at 2059.

### (iii) Narrowly Tailored State Action

[¶ 29] Next, we must determine whether the State's action is narrowly tailored to serve the identified compelling state interest. *See Glucksberg,* 521 U.S. at 721, 117 S.Ct. 2258 (citing *Flores,* 507 U.S. at 302, 113 S.Ct. 1439). Several aspects of the Act are central to our analysis. First, a grandparent must establish standing *before* litigation may commence on a petition. 19–A M.R.S.A. §§ 1803(1), 1803(2)(A)–1803(2)(C). Second, the court must consider any objection of the parents concerning an award of rights of visitation or access by the grandparents. 19–A M.R.S.A. § 1803(2)(D). Third, the court may not grant visitation if doing so would significantly interfere with any parent-child relationship or with the parent's rightful authority over the child. 19–A M.R.S.A. § 1803(3).

[¶ 30] Each of these requirements provides safeguards against unwarranted intrusions into an intact family's life. The first requirement, that the grandparents demonstrate standing before they may litigate their claim, provides protection against the expense, stress, and pain of litigation, unless and until the grandparents have convinced the court that they are among those grandparents who may pursue visits under the Act. 19–A M.R.S.A. §§ 1803(1), 1803(2)(A)–1803(2)(C). Trial courts must be vigilant in their application of this requirement in order to effectuate the Legislature's efforts to narrowly tailor the Act to serve the compelling interest of

17. Because we address only the facts before us, we do not determine whether the State would have a compelling interest in circumstances where the grandparents assert a different type of "sufficient relationship." 19–A M.R.S.A. § 1803(1)(B). Ordinarily, the State's interest in parents' childcare decisions is merely "de minimis" and does not provide a compelling basis for state intervention. *See Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *Stanley v. Illinois,* 405 U.S. 645, 657–58, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

the State. Both the plurality in *Troxel* and Justice Kennedy's dissent stressed this factor, stating that "the burden of litigating a domestic relations proceeding can itself be 'so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated.' " *Troxel,* 530 U.S. at ——, 120 S.Ct. at 2065 (quoting Justice Kennedy's dissenting opinion at 530 U.S. at ——, 120 S.Ct. at 2079).[18]

[¶ 31] The second protective aspect of the Act, the requirement that the trial court give consideration to the parent's objection to visitation, is equally important. 19–A M.R.S.A. § 1803(2)(D). This provision gives life to the presumption that the parents are acting in the best interests of their child. *See Troxel,* 530 U.S. at ——, 120 S.Ct. at 2061 (citing *Parham,* 442 U.S. at 602, 99 S.Ct. 2493). The court may not simply consider the best interests of the child, but must also consider and give significant weight to the parents' position, thus preventing the court from intervening in a fit parent's decision making simply on a best interests basis. *See id.* 530 U.S. at ——, 120 S.Ct. at 2062.

[¶ 32] The third protection provides similar limits on the court's authority, precluding the court from awarding visits or access to grandparents unless the court finds that those visits would not "significantly interfere" with the parent-child relationship or with the parent's rightful authority over the child. 19–A M.R.S.A. § 1803(3). Again, the court must focus its attention, not solely on the determination of the best interests of the child, but also on how the

visitation would affect the parents' relationship with that child. *Id.* If the court determines that visits with a grandparent will significantly interfere with the parent-child relationship, that determination precludes any further intrusion into the parent's decision. *See id.*

## E. Conclusion

[¶ 33] We conclude therefore that where the grandparents have acted as the children's parents for significant periods of time, the Grandparents Visitation Act serves a compelling state interest in addressing the children's relationship with the people who have cared for them as parents. Because the Act is narrowly tailored to serve that compelling interest, it may be applied in this case without violating the constitutional rights of the parents.

[¶ 34] Accordingly, we must vacate the judgment of the District Court. We note with approval the District Court's effort to avoid further delays in this matter by finding the facts and entering a visitation order that could be effectuated in the event that our constitutional analysis differed from that of the court. Our conclusion that the statute can be applied constitutionally on the facts before us is not determinative, however, on the appropriateness of visitation itself. Given the need for a careful application of the restrictions of the Act and the passage of time since the entry of the court's judgment, we remand the matter to the trial court for further hearing.

The entry is:

---

18. The Maine judiciary has been sufficiently concerned about the detrimental effects litigation has on families in turmoil that a Commission was formed to seek alternatives to litigated resolutions. *See* Sumner Bernstein, *Nonadversarial Administrative Forum Report,* 11 ME. B.J. 366 (1996); *see also* Dana E. Prescott, *Parental Conflict and the Appointment of Referees in Child Custody Cases,* 15 ME. B.J. 44 (2000) ("One of the daunting challenges facing the legal system at the end of the millennium is to find effective ways to

protect children from the chaos and conflict created by feuding parents in custody cases."). Indeed, as the Maine Commission on Gender, Justice, and the Courts concluded in a recent report, "[r]esolution of custody disputes through the adversarial process is, among other things, damaging to the psychological well-being of children and parents." JUDICIAL BRANCH PERFORMANCE COUNCIL, REPORT ON THE IMPLEMENTATION OF THE RECOMMENDATIONS OF THE MAINE COMMISSION ON GENDER, JUSTICE, AND THE COURTS 9 (2000).

Judgment vacated. Remanded to the Superior Court with instructions to remand to the District Court for further proceedings consistent with the opinion herein.

WATHEN, C.J., with whom RUDMAN, J., joins, concurring.

[¶ 35] I concur in the result reached by the Court but write separately to distance myself from the curiously ambiguous and restricted conclusion "that the state does have a compelling interest in providing a forum within which grandparents who have acted as parents to their grandchild may seek continued contact with that child." The District Court held that the Grandparents Visitation Act violates the Fourteenth Amendment to the United States Constitution on its face because it requires no showing of harm to the child before a court can order visitation with a grandparent. The court also concluded that the "best interest standard is not a compelling state interest by itself." With the advantage of the teaching in *Troxel,* I reject the notion that the Act is invalid on its face and that the application of the best interests of the child standard is always unconstitutional in the context of grandparent visitation.[19]

[¶ 36] In my judgment, the issue before us is whether the Act can ever be applied constitutionally. Although the United States Supreme Court stopped short of ruling on this precise issue, the opinion in *Troxel* is instructive and persuades me that the Act survives a facial challenge.

[¶ 37] I begin my analysis, as did the United States Supreme Court, in *Troxel,*

by recognizing that the passage of the Act in Maine and similar statutes in every one of the other forty-nine states reflect profound changes in the structure of the American family.

The demographic changes of the past century make it difficult to speak of an average American family. The composition of families varies greatly from household to household. While many children may have two married parents and grandparents who visit regularly, many other children are raised in single-parent households. In 1996, children living with only one parent accounted for 28 percent of all children under age 18 in the United States. U.S. Dept. of Commerce, Bureau of Census, Current Population Reports, 1997 Population Profile of the United States 27 (1998). Understandably, in these single-parent households, persons outside the nuclear family are called upon with increasing frequency to assist in the everyday tasks of child rearing. In many cases, grandparents play an important role. For example, in 1998, approximately 4 million children—or 5.6 percent of all children under age 18—lived in the household of their grandparents. U.S. Dept. of Commerce, Bureau of Census, Current Population Reports, Marital Status and Living Arrangements: March 1998 (Update), p. *i* (1998).

The nationwide enactment of nonparental visitation statutes is assuredly due, in some part, to the States' recognition of these changing realities of the American family. Because grandparents and other relatives undertake duties of a parental nature in many households, States have sought to ensure the welfare of the children therein by protecting the relationships those

---

**19.** The District Court in the present case took evidence, addressed the merits hypothetically, and purported to find the Act unconstitutional *as applied.* In fact, the court concluded that *a showing* of harm to the children is essential to justify any interference with parental rights, and that the best interests standard

alone is never sufficient. In effect, the court found that the Act could never be applied constitutionally and fails a facial challenge, *see City of Chicago v. Morales,* 527 U.S. 41, 63–64, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999); *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

children form with such third parties. The States' nonparental visitation statutes are further supported by a recognition, which varies from State to State, that children should have the opportunity to benefit from relationships with statutorily specified persons—for example, their grandparents.

*Troxel v. Granville,* 530 U.S. 57, ——, 120 S.Ct. 2054, 2059, 147 L.Ed.2d 49 (2000) (O'Connor, J., plurality opinion).

[¶ 38] In *Troxel,* the United States Supreme Court was presented with the State of Washington's version of a nonparent visitation statute. The Washington statute is significantly broader than the Maine Act. *See* WASH. REV. CODE ANN. §§ 26.10.160, 26.09 .240 (1998) (allowing any third party to petition for visitation at any time, subject only to the best interests of the child). Our Act is confined to grandparents and in this case requires a "sufficient existing relationship" between grandparent and child, *see* 19–A. M.R.S.A. § 1803(1)(B); no significant interference with the parent-child relationship, *see* § 1803(3); in addition to a finding that visitation is in the best interests of the child. *See* § 1803(3). The Washington Supreme Court struck down its statute on the basis of the Federal Constitution and held that the statute unconstitutionally infringed on the fundamental right of parents to rear their children. *Troxel,* 530 U.S. at ——, 120 S.Ct. at 2058. That ruling rested on the fact that the statute requires no threshold showing of harm and also that by allowing " 'any person' to petition for forced visitation of a child at 'any time' with the only requirement being that the visitation serve the best interest of the child" the statute sweeps too broadly. *See id.* (citing *In re Custody of Smith,* 137 Wash.2d 1, 969 P.2d 21, 28–30 (1998)). In a plurality opinion, four members of the United States Supreme Court declined to declare the statute unconstitutional on its face. Rather, they found it unconstitutional as applied. In doing so, they emphasized the need for care in elaborating the precise scope of parental due process rights in the visitation context and observed that "[b]ecause much state-court adjudication occurs on a case-by-case basis, we would be hesitant to hold that specific nonparental visitation statutes violate the Due Process Clause as a *per se* matter." *Troxel,* 530 U.S. at ——, 120 S.Ct. at 2064 (O'Connor, J., plurality opinion). Two of the dissenting justices, Justices Stevens and Kennedy, concluded, each for different reasons, that the facial challenge to the statute should fail and Justice Kennedy opined persuasively that a parent does not have a constitutional right to prevent visitation in all cases not involving harm. *See id.* 530 U.S. at ——, 120 S.Ct. at 2068 (Stevens, J., dissenting); *id.* 530 U.S. at ——, 120 S.Ct. at 2075 (Kennedy, J., dissenting). Taking into account the separate view of Justice Scalia that, as a judge, he is without authority to deny legal effect to laws that infringe upon rights that are not enumerated in the Constitution, *see id.* 530 U.S. at ——, 120 S.Ct. at 2074 (Scalia, J., dissenting), I can come to only one conclusion—on the basis of existing federal precedent, Maine's Grandparent Visitation Act does not facially violate the Due Process Clause.[20]

[¶ 39] The inquiry, however, does not end here. The Act escapes a facial challenge, not solely because the grandparents in this case may be de facto parents as relied upon by the Court. Rather, the Act escapes facial invalidity because it operates within the rich confluence of the constitutional interests of the parents, the children, the state, the grandparents, and the family, whether these interests are derivative or otherwise. In this complex context,

---

**20.** Justice Souter voted to affirm on the basis that the statute "sweeps too broadly and is unconstitutional on its face." *Id.* 530 U.S. at ——, 120 S.Ct. at 2066 (Souter, J., concurring in the judgment). Justice Thomas voted to affirm on the basis that the statute could not survive analysis in accordance with the strict scrutiny standard of review. *See id.* 530 U.S. at ——, 120 S.Ct. at 2068 (Thomas, J., concurring in the judgment).

categorical statement and pronouncements of facial invalidity must yield to careful balancing of the competing constitutional interests of all. To focus with strict scrutiny, as does the Court, on the compelling interest of the state, vis-a-vis the parents, is to ignore what may in a particular case be the equally compelling interests of the children, the family, and the grandparents. The District Court must apply the Act with great sensitivity in order to balance and protect the rights of all parties and not run afoul of the constitution. Although the United States Supreme Court has not as yet definitively catalogued the factual considerations or decisional frameworks that are constitutionally required or appropriate, developing caselaw offers guidance.

[¶ 40] As the United States Supreme Court grappled with the changes in American society that started in the 1960s and continue to the present day, the Court has consistently expanded the definition of family and recognized that individuals other than biological or adoptive parents may exercise child-rearing authority. This broader understanding of the parent-child relationship led the Court to acknowledge the rights of nonparents to be a part of a child's life. *See Moore v. City of East Cleveland*, 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). In *Moore*, an ordinance attempted to restrict children from living with their extended families, specifically with their grandparents. *See id.* at 499–506, 97 S.Ct. 1932. The Court held that this sort of "family choice" is a constitutionally-protected area under the Due Process Clause even when parents are not involved. *See id.* In particular, the Court ruled that a grandmother had the right to live with her grandchildren. *See id.* at 504, 97 S.Ct. 1932.

> Ours is by no means a tradition limited to respect for the bonds uniting the members of the nuclear family. The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally de-

serving of constitutional recognition.... Decisions concerning child rearing, which [*Wisconsin v.*] *Yoder* [406 U.S. 205, 92 S.Ct. 1526 (1972) ], *Meyer*], 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042], *Pierce*[, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070] and other cases have recognized as entitled to constitutional protection, long have been shared with grandparents or other relatives who occupy the same household—indeed who may take on major responsibility for the rearing of the children.

*Id.* at 504–05, 97 S.Ct. 1932; *see also id.* at 508–13, 97 S.Ct. 1932 (Brennan, J., concurring) (discussing the increasing number of nontraditional families in the United States and their right to constitutional protection); *Stanley v. Illinois*, 405 U.S. 645, 651–52, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (recognizing the parental rights of a biological father who is not married to his child's biological mother). The United States Supreme Court has also reaffirmed that the State may regulate the behavior of adults, including parents, in the attempt to protect the constitutional rights of children. *See Bellotti v. Baird*, 428 U.S. 132, 147, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Ginsberg v. New York*, 390 U.S. 629, 637–41, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968). It is constitutionally significant that the Maine Act requires a "sufficient existing relationship." Although in my judgment it is not controlling, it is also significant that in the present case, the grandparents may have acted as caregivers over a significant period of time and may have developed a close relationship with the children. Some courts, without statutory authority, have modified the common law presumption and opened the door to visitation by adults who have become the de facto parent of a child. *See In re Custody of H.S.H.-K.*, 193 Wis.2d 649, 533 N.W.2d 419, 421 (1995); *see S.F. v. M.D.*, 132 Md.App. 99, 751 A.2d 9, 15 (2000); *V.C. v. M.J.B.*, 163 N.J. 200, 748 A.2d 539, 551–54 (2000); *E.N.O. v. L.M.M.*, 429 Mass. 824, 711 N.E.2d 886, 892–93, *cert. denied*, —— U.S. ——, 120 S.Ct. 500, 145 L.Ed.2d 386 (1999). Addi-

tionally, the American Law Institute (ALI) has suggested that being a de facto parent may create a lawful basis to grant court-ordered visitation. *See* PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 2.03(1)(c) (Tentative Draft No. 4, 2000). By confining the Act to de facto parents in the present case, the Court unnecessarily strips the Act of any significance beyond the limited results that could be achieved at common law.

[¶ 41] One of the primary constitutional deficiencies in the application of the Washington statute in *Troxel* was the fact that the trial court gave no special weight to the parent's determination of her daughter's best interests. In doing so, the court violated the constitutional presumption "that fit parents act in the best interests of their children." *Id.* 530 U.S. at ——, 120 S.Ct. at 2061. As noted in *Troxel*, the Maine Act affords a special measure of protection for parental decision making by requiring the court to find that grandparent visitation would not significantly interfere with any parent-child relationship or with the parent's rightful authority over the child. *See id.* 530 U.S. at ——, 120 S.Ct. at 2062 (citing 19–A M.R.S.A. § 1803(3)). In applying the Act, it is important for trial courts to appreciate that the decisions of fit parents are entitled to special weight and that this principle is embedded in the Act and is required by the Constitution.

[¶ 42] In *Troxel*, the United States Supreme Court also criticized the failure of the Washington trial court to credit the fact that the parent had voluntarily provided visitation to the grandparents, never sought to deny visitation, and resisted only the expanded visitation the grandparents demanded. The Maine Act does not, as do the statutes in many other states, expressly condition an award of visitation on a parent's denial or unreasonable denial of visitation to the grandparent. Such considerations, however, fit comfortably within the comprehensive formulation of best interests set forth in the Act. *See* 19–A M.R.S.A. § 1803(3)(H), (I).

[¶ 43] Finally, *Troxel* introduces a note of caution about sweeping interpretations and applications of nonparental visitation statutes. The Act deals with an important right described as follows by the Supreme Court:

> The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court.
>
> . . .
>
> "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."

*Troxel,* 530 U.S. at ——, 120 S.Ct. at 2060 (citation omitted). Courts must afford primacy and weight to the interests and views of a fit parent and are not free to resolve a difficult call by splitting the difference as the Washington trial court did in *Troxel.*

[¶ 44] The present case illustrates the more exacting decisional framework that is required. Here, the court determined hypothetically that the requirements of the Act had been met and indicated that if the Act were constitutional, it would order visitation. The court went on to note, without explanation, that if the children were to be exchanged, it would be accomplished under the supervision of a third party or guardian ad litem and the parents and grandparents were not to be present at the delivery point at the same time. Although such a ready solution may be appropriate in a divorce setting for resolving a conflict in parental rights, in the context of grandparent visitation, it also implicates the analysis of best interests. The capacity of the parents and grandparents to cooperate and resolve disputes is an explicit part of the best interests analysis required by the Act in determining whether visitation

should be ordered. *See* 19–A M.R.S.A. § 1803(3)(H), (I).

[¶ 45] One court has usefully observed that "[a]s a general proposition, visitation awarded to adults is not for their gratification or enjoyment, but to fulfill the needs of the child." *Fairbanks v. McCarter*, 330 Md. 39, 622 A.2d 121, 126 (1993). As the United States Supreme Court has noted, "[t]he extension of statutory rights in this area to persons other than a child's parents, however, comes with an obvious cost," and could "place a substantial burden on the traditional parent-child relationship." *Troxel*, 530 U.S. at ——, 120 S.Ct. at 2059. Under the Act, it is the court's function to order visitation only under the limited circumstances when it will benefit the child, and then, only if that benefit can be realized without significantly burdening or interfering with the parent-child relationship.[21]

[¶ 46] Because, in my judgment, the Act is not facially unconstitutional, I join in vacating the dismissal of the action and remanding for further proceedings.

ALEXANDER, J., dissenting.

[¶ 47] I respectfully dissent. The Court's opinion thoroughly and correctly reviews the governing legal principles which we must apply to determine the constitutionality of the Grandparents Visitation Act. In the Court's analysis of that law, I only disagree with its conclusion that a partially constitutional application of a law justifies an interpretation of that law that is totally unsupported in the wording of the statute itself. Separately, the facts of this case, found by the trial court, require judgment for the parents.

[¶ 48] The Court states the governing principle of interpretation that "if we can reasonably interpret a statute as satisfying ... constitutional requirements, we must read it in such a way." *Ante*, ¶ 14 (Court's opinion). To apply this principle of interpretation, there must be some words to interpret. However, the Court cites no words in the statute that may be interpreted to limit its application to parent substitutes' or "de facto" parents' rights to sue. Rather, the Grandparents Visitation Act is an invitation to any and all comers who can call themselves grandparents to bring suit to disrupt a family unit. This is not the narrow tailoring that strict scrutiny demands of a statute that invades a fundamental interest, and the Court's mixing of the concepts of application of law and interpretation of law cannot make it so.

[¶ 49] The Court's approach is analogous to holding that a statute authorizing stop and seizure of motorists without reason is constitutional if, in two out of three instances, the authorities had probable cause to stop and seize. The narrow tailoring mandate is not satisfied by trusting those given authority under broadly unconstitutional statutes to apply those statutes only narrowly and constitutionally.

[¶ 50] A parent's right to direct the upbringing and control of their children is not a right to be lightly cast aside whenever the State or the courts think they have a better idea about how children should be raised. As the *Troxel* plurality opinion and the majority of this Court recognize, parental rights to direct their children's upbringing and control are a "fundamental" liberty interest protected by the Due

---

**21.** The Act seeks to minimize the potential burden on parents by requiring the court to first consider a petition summarily on affidavits before ordering an evidentiary hearing. Only if the court determines on the basis of the petition and the affidavits that "it is more likely than not that there is a sufficient existing relationship or ... that a sufficient effort *to* establish one has been made," should the court proceed to a hearing. 19–A M.R.S.A. § 1803(2)(C). Here, the parents responded to the grandparents' affidavit with a motion to dismiss. The court leapfrogged over the procedural requirements of the Act and went directly to the merits and the constitutional challenge. In addition, the Act authorizes the court to award "costs, including reasonable attorney's fees, for defending or prosecuting actions ...." § 1803(6). Because of constitutional sensitivities and practical considerations, courts should be scrupulous in following the procedures specified in the Act.

Process Clause. *Troxel v. Granville*, 530 U.S. 57, ——, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000); *Ante*, ¶ 18 (Court's opinion).[22] In another context, the Fifth Circuit recently observed that the "most essential and basic aspect of familial privacy—[is] the right of the family to remain together without the coercive interference of the awesome power of the state." *Morris v. Dearborne*, 181 F.3d 657, 667 (5th Cir.1999) (quoting *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir.1988)).

[¶ 51] When a fundamental liberty interest is at stake, as it is here, any state invasion of that interest must be subject to strict scrutiny. *Ante*, ¶ 19 (Court's opinion); *Washington v. Glucksberg*, 521 U.S. 702, 719–21, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997); *Sch. Admin. Dist. No. 1 v. Comm'r, Dep't of Educ.*, 659 A.2d 854, 857 (Me.1995). Under strict scrutiny, invasive state action can only be saved if it is narrowly tailored to serve a compelling state interest. *Ante*, ¶ 19 (Court's opinion); *see also Reno v. Flores*, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *Collins v. City of Harker Heights*, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Butler v. Supreme Judicial Court*, 611 A.2d 987, 992 (Me.1992).

[¶ 52] The challenge of justifying government invasion of the rights of fit parents is particularly great because the United States Supreme Court has observed that the government has only a "de minimis" interest in child care decision making by a fit parent. *See Stanley v. Illinois*, 405 U.S. 645, 657–58, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). Reflective of this "de minimis" state interest, "there is a presumption that fit parents act in the best

interests of their children." *Troxel*, 530 U.S. at ——, 120 S.Ct. at 2062 (citing *Parham v. J.R.*, 442 U.S. 584, 602, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979)).

[¶ 53] The strict scrutiny test, the requirement that an invasion of parental rights be narrowly tailored and justified by a compelling state interest, and the presumption that fit parents act in the best interest of their children all cannot be avoided by a generalized statement that "[a] statute is presumed to be constitutional and the person challenging the constitutionality has the burden of establishing its infirmity." *Ante*, ¶ 14 (Court's opinion). When the State undertakes intrusive regulation of the family, "the usual judicial deference to the legislature is inappropriate." *Moore v. City of E. Cleveland*, 431 U.S. 494, 499, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977). Application of the strict scrutiny test demands justification of state action by demonstrating that it is narrowly tailored to serve a compelling state interest, not abdication of rigorous analysis by resort to a presumption.

[¶ 54] At first blush the Grandparents Visitation Act evokes images of Norman Rockwell's America: what some believe were better, simpler family times. The harsh reality of this law in application is closer to Orwell[23] than Rockwell. Except in cases of a deceased or disappeared parent, the law will only be invoked by grandparents whose relationship with their own children has failed so badly that they must resort to lawsuits to visit the relationship problems with their children on the next generation. Where parent-grandparent lifestyle choices differ and relationships

---

**22.** We have repeatedly held that both the Maine and Federal Constitutions recognize "a fundamental and important" right of parents to raise their children. *In re Heather C.*, 2000 ME 99, ¶ 23, 751 A.2d 448, 454; *State v. Wilder*, 2000 ME 32, ¶ 20, 748 A.2d 444, 449; *In re Christmas C.*, 1998 ME 258, ¶¶ 10–11, 721 A.2d 629, 631–32; *In re Alexander D.*, 1998 ME 207, ¶ 14, 716 A.2d 222, 226–27. This fundamental liberty interest of parents to raise their children includes the right "to di-

rect the upbringing and education of children." *Wilder*, 2000 ME 32, ¶ 20, 748 A.2d at 449 (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)). *See also Meyer v. Nebraska*, 262 U.S. 390, 399–400, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

**23.** GEORGE ORWELL, 1984 (HARCOURT BRACE 1983) (1949).

are strained, the law presents the prospect of competent parents being caught in a withering crossfire of lawsuits by as many as four sets of grandparents demanding involvement in the grandchildrens' lives.[24] These suits will be resolved by judges applying a law which provides virtually no guidance except the "best interest" standard. That standard delegates to judges authority to apply their own personal and essentially unreviewable lifestyle preferences to resolving each dispute. *See Troxel,* 530 U.S. at ——, 120 S.Ct. at 2064. Each such resolution, successful for the grandparents, will usurp the parents' authority over the child and unavoidably insert the stress of litigation, dispute, and uncertainty into the grandchildren's lives.

[¶ 55] As the trial court observed in its opinion:

> The reason these type of suits are brought are because hostility between the parent and grandparent exist in these, the most dysfunctional of cases. The economic consequences of the action could be disastrous to the parent and, derivatively, the child. As written, there is no real barrier to prevent a grandparent, who has more time and money than the child's parents, from petitioning the court for visitation rights. A parent who does not have the up-front out-of-pocket expense to defend against the grandparent's petition may have to bow under the pressure even if the parent honestly believes it is not in the best interest of the child. The awarding of attorney fees post-hearing does not provide a parent with the out-of-pocket expenses required before any petition is filed or any hearing has begun. Such suits cannot ethically be taken on a con-

tingent fee. If a parent were required to defend against such suit they may have to make sacrifices that are detrimental to the child. For example, instead of being able to buy the child a winter jacket the parent may have to pay an up-front fee to the attorney. Absent a showing of harm to the child when the grandparent petitions the court for a hearing the parent should not be forced to make these sacrifices.

[¶ 56] To add insult to injury, the Act presents the prospect that parents resisting grandparents' efforts to usurp parental authority may be forced to pay the grandparents' costs and attorney fees. *See* 19–A M.R.S.A. § 1803(6) (1998).[25] This prospect can greatly add to the pressures and stress of litigation, and must be soberly considered as the constitutional validity of this law is examined.

[¶ 57] Proper constitutional analysis requires that we ask the following questions:

1. Does the State have a compelling interest in authorizing lawsuits by grandparents who have failed in relationships with their own children in order to gain access to their children's children; and

2. If so, is the means selected, the Grandparents Visitation Act, sufficiently narrowly tailored to serve that interest?

[¶ 58] On the first point, the Court has apparently found "compelling" a state interest which the United States Supreme Court has called "de minimis."[26] For purposes of this opinion only, some compelling state interest in legislating to protect de facto parents as addressed in the Court's opinion will be assumed and not addressed

---

**24.** The number four would occur if each grandparent divorced and remarried. The number could be greater where, as here, the family that is the target of litigation includes several children by different fathers.

**25.** 19–A M.R.S.A. § 1803(6) states:
6. Cost and fees. The court may award costs, including reasonable attorney's fees,

for defending or prosecuting actions under this chapter.
19–A M.R.S.A. § 1803(6) (1998).

**26.** *See Stanley v. Illinois,* 405 U.S. 645, 657–58, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (stating that the government has only a "de minimis" interest in child-care decision making by a fit parent).

further. However, the means selected to achieve that assumed compelling state interest do not meet the requirement that they be narrowly tailored to serve that particular interest.

[¶ 59] The law provides that:

— Any grandparent can file a lawsuit and haul the parents into court to defend their parental prerogative to control third party access to their children.

— Except where a parent has died,[27] grandparents filing suits need demonstrate no particular relationship between the grandparent and the child. An expressed desire to establish a relationship is all that is needed to open the courthouse door.[28]

— Grandparent access decisions are to be adjudicated based on the amorphous "best interest of the child" standard, and decided according to the preponderance of the evidence burden of proof.

[¶ 60] *Troxel* indicates that such an open-ended invitation to grandparent lawsuits is too broad to meet due process requirements. The *Troxel* plurality holds such authority to be too broad because it gives the government, acting through the courts, virtually unfettered discretion to supersede parental decisions as to what is best for their children without any special weight being given to the parents' determination to deny access. *See Troxel,* 530 U.S. at ——, 120 S.Ct. at 2062.

[¶ 61] The findings required by Maine law that visitation "would not significantly interfere with any parent-child relationship or with the parent's rightful authority over the child," 19–A M.R.S.A. § 1803(3), do not provide sufficient qualification to save the statute. Any lawsuit by grandparents against parents seeking court intervention to force access to the grandchildren is a significant interference with the parent-child relationship and the parent's rightful authority over the child. Trial courts can make the "no significant interference" finding only by engaging in a sophistry that such lawsuits have insignificant impact.

[¶ 62] As Justice Kennedy's dissent in *Troxel* notes, an act authorizing a lawsuit by third parties to intervene in the parent-child relationship is, by itself, a "state intervention that is so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child's welfare becomes implicated." *Id.* 530 U.S. at ——, 120 S.Ct. at 2079 (Kennedy, J., dissenting). Thus, as a matter of law, a lawsuit invoking the Grandparents Visitation Act, with all its implications, is a significant interference in the parent-child relationship. Further, where a fit parent has decided against grandparent access for

---

**27.** The deceased parent provision of the law, 19–A M.R.S.A. § 1803(1)(A) (1998), is not at issue here, and this opinion does not address the constitutionality of that provision.

**28.** The provisions of the Grandparents Visitation Act implicated in this case are section 1803(1)(B), authorizing lawsuits by grandparents who allege they have "a sufficient existing relationship" with a grandchild, and section 1803(1)(C) authorizing lawsuits where there is no existing relationship, but the grandparents allege they have made an effort to establish a relationship. 19 M.R.S.A. § 1803(1)(B), (1)(C). Subparagraph B is asserted to apply to Keiko and Roman. Subparagraph C must apply to Mariah, who the trial court found to have a relationship only "derivatively" because of the relationships with the other children and because she had some relationship with the grandparents in the first three months of her life—now seven years ago. This relationship is certainly not a "sufficient existing relationship" under subparagraph B unless we strain the definition of that term beyond the breaking point. In fact, considering the complete lack of an existing relationship which the trial court found, a relationship that has been non-existent for all the children since 1994, subparagraph C is the only proper basis to press the claim to force access to all three children. A past failed relationship is not a "sufficient existing relationship," unless this term in subparagraph B is given a meaning outside the common understanding of the term.

reasons which, as a matter of law, are presumed to be in the child's best interest, *see id.* 530 U.S. at —— ——, 120 S.Ct. at 2061–62, a court order imposing an association that the parent opposes is unavoidably a severe insult to the parent's rightful authority over the child.

[¶ 63] The plurality opinion in *Troxel* directs that rather than disregarding the parents' own determination, the court must give it special weight. *Id.* 530 U.S. at ——, 120 S.Ct. at 2062. If a trial court gives the parent's own determination regarding access to their children the special weight required, then making the "no significant interference" findings cited by the Court to save the statute [29] is a legal and logical impossibility.

[¶ 64] The history of this case demonstrates the importance of respecting fit parents' associational choices and recognizing the mischief promoted by the Act's authorizing lawsuits to interfere with those choices. The Riendeaus have now been married for eight years. There is no dispute in this record that, presently, they are fit parents for the children. The trial court's findings note the difficulties the marriage has had, primarily as a result of attempted interference by the grandparents since 1992:

> They separated during the summer of 1993, primarily because of the tensions created by Rose's [the grandmother's] interference in their family unit .... As the communications broke down finally between Rose and Heaven, Rose resorted to reporting Jeffrey to the police, resulting in a search warrant being executed on their house. In addition, she filed a report with the Department of Human Services, alleging abuse and neglect, and filed two suits against the defendant: an action in the Probate Court to adopt Keiko, and the instant case. All communications have since broken off, and plaintiffs are not getting any visitation or communication with the three children.

[¶ 65] With this history, the parents' decision to limit association of their children with the grandparents is hardly surprising. Rather, it appears a legitimate expression of self-respect and family integrity. As the trial court found: "If this question were posed to the court in 1994, the conclusion would be inescapable that visitation would inject Rose too closely into the defendants' family unit, with catastrophic effect." This finding is essentially a finding that there was no "sufficient existing relationship" between the grandparents and the children in 1994, a year before suit was filed. It makes application of section 1803(1)(B) conceptually difficult.

[¶ 66] The remainder of the trial court's opinion appears to look at the visitation prospects from the point of view of the grandparents and the children to determine that some visitation might be appropriate, except for the constitutional problem. This analysis ignores the direction of *Troxel* that a special, elevated level of consideration be given to the parents' views on these issues. The trial court thought it necessary to include in its order a specific prohibition on the grandparents making derogatory comments about the parents. This confirms that the court was not fully confident of its determination that the visitation order would not significantly interfere with the parent-child relationship or the parents' rightful authority over the children.

[¶ 67] Thus, beyond the constitutionality problem, the Court could not legitimately order visitation in light of its findings regarding: (i) the horrible relationship between the parents and the grandparents; (ii) the grandparents' continued efforts to interfere in the parents and their children's lives; and (iii) the appropriateness of the severance of the grandparent-child relationship well before suit was filed. With the directive in *Troxel* properly applied—a directive which the trial court did not have when it rendered its decision—

---

**29.** *Ante,* ¶ 32 (Court's opinion).

the findings made by the trial court itself demonstrate that if the reasons for the parents' decision are given special and elevated consideration, an award of visitation rights to the grandparents cannot be supported under section 1803(3). Where the parents had legitimate reasons, found by the court, for terminating access to grandparents who had engaged in a four-year effort to interfere with and disrupt the parent-child relationships of the Riendeau family, it is evident that a no significant interference finding cannot be made on the present record.

[¶ 68] It is possible to posit a statute, much more narrowly drawn, that could survive a constitutional challenge and meet the requirements that a compelling state interest be properly defined with any remedy narrowly tailored to serve that interest. Such a statute could include a prerequisite finding of harm to the child from a parent's denial of some association with a grandparent. As a prerequisite for filing suit, the statute might also require, as the Court's opinion suggests, some demonstration of a prior parent-like relationship with the child, not just an aspirational hope that a relationship might be created, or an allegation of some minimal relationship, which is all the present law requires. *See* 19–A M.R.S.A. § 1803(1)(B), (1)(C) (1998). The law might also require a heightened burden of proof and some other provision to respect the direction of *Troxel* that a fit parent's decisions be given some special, heightened weight.

[¶ 69] Except for the deceased parent prerequisite which is not implicated here, the *Grandparents Visitation Act*, as presently drafted, includes none of the prerequisites which would be essential (i) to properly define the compelling State interest to support interference with the fundamental liberty interest of parents to control their children; and (ii) to narrowly tailor any remedy to serve that interest. The present act presents an open invitation for grandparents who claim or hope to claim a relationship with a grandchild to file a lawsuit and have their claim or hope adjudicated according to the "best interest" standard, a standard which *Troxel* indicates is not enough to save constitutionality. This case is distinguishable from *Troxel* only by the Maine Act's requirement of subsidiary findings of "no significant impact" that cannot be made except by taking the facially incredible view that such lawsuits have no significant impact on the target parents and children. Proper application of the strict scrutiny test and due process protections requires more.

[¶ 70] Accordingly, I would affirm the judgment.