MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:     2018 ME 76
Docket:       Cum-17-310
Argued:       February 15, 2018
Decided:      June 12, 2018

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.
Majority:     SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, HJELM, and HUMPHREY, JJ.
Dissent:      JABAR, J.

DEBORAH E. LAMKIN

v.

CORRIE L. LAMKIN

HJELM, J.

[¶1]  Deborah E. Lamkin appeals from a judgment entered by the District Court (Portland, *J. French, J.*) concluding that she did not have standing to pursue a claim for visitation rights with her grandchild pursuant to the Grandparents Visitation Act (GVA), 19-A M.R.S. §§ 1801-1805 (2017), and, on that basis, dismissing her petition.  On appeal, Deborah contends that the court erred in its standing determination.  Because Deborah failed to demonstrate standing to proceed either pursuant to the GVA or as a putative de facto parent—a claim that is suggested in some of Deborah's filings and that she presses on appeal—we affirm the judgment.

## I. BACKGROUND

[¶2]  The following facts are drawn from the procedural record and the court's findings, which are supported by the record.  *See Philbrook v. Theriault*, 2008 ME 152, ¶ 2, 957 A.2d 74.

[¶3]  Deborah E. Lamkin is the mother of Corrie L. Lamkin and the grandmother of the child at issue here.  Corrie gave birth to the child in 2008. For the two years following the child's birth, Corrie and her child lived with Deborah and Deborah's husband until Corrie and the child moved into their own home.  After Corrie and the child moved, Deborah had contact with the child "several days per week," including "almost every weekend."  After the child entered daycare, Deborah cared for him two days per week.  Once the child started school, on Wednesdays, Deborah met him when he got off the bus, and he stayed for dinner at her house.  That pattern continued until December of 2016, when Corrie became involved in a relationship with her current boyfriend, who causes Deborah concern because he is a registered sex offender.

[¶4]  On June 2, 2017, Deborah filed a petition, accompanied by an affidavit, *see* 19-A M.R.S. § 1803(2)(A), to "establish grandparent's rights" pursuant to the GVA, seeking "specific rights of visitation, contact, etc., and/or

. . . primary physical residence" of the child.[1]  In addition to reciting many of the facts noted above, which were later addressed in the judgment, Deborah stated in her affidavit that in February of 2017, Corrie left the child with her for five days while Corrie visited Florida, and later that month, both Corrie and the child stayed at Deborah's residence for three weeks after Deborah's husband died. Deborah also alleged that since March of 2017, Corrie has prevented her from having contact with the child.  She concluded her affidavit as follows:

> I feel that [the boyfriend] is not a good influence on my daughter, and may present a safety hazard for [the child].  I feel it is in [the child's] best interest to have specific rights of contact and visitation with me, at specific times and dates, and/or for [the child's] primary physical residence to be with me.

[¶5]  In response, Corrie filed a motion to dismiss for lack of standing.  As allowed by statute, *see* 19-A M.R.S. § 1803(2)(B), Corrie also filed an affidavit in which she stated, among other things, that since the child was three months old, he has been consistently enrolled in daycare or afterschool care and that Deborah has never provided or offered to provide full-time care for the child;

---

[1]  Deborah's petition named Corrie and the person believed to be the child's father as the respondents.  In the affidavit filed with her petition, Deborah stated that the putative father did not believe that the child was his and has had little or no contact with Corrie or the child.  The record does not indicate that the putative father was served, and he has not participated in this proceeding. Title 19-A M.R.S. § 1803(2)(A) (2017) requires that a GVA petition and accompanying affidavits need only be served on one of the parents or legal guardians of the child.  Here, Corrie accepted service of the petition, which allowed the matter to proceed.

that the boyfriend's conviction was based on electronic sexual communications with a teenage girl; that Corrie has attended some of her boyfriend's therapy sessions so she could learn of anything needed for the child's safety; that the boyfriend's probation officer has approved of the boyfriend's contact with the child; that, at Corrie's request, the probation officer notified the Department of Health and Human Services of Corrie's relationship with the boyfriend "to make sure we had proper approval from every possible angle and that we were above board," and that the Department chose not to investigate or become involved in the matter; that, at an activity the child regularly attends, Deborah has had contact with him against Corrie's wishes; and that Deborah is attempting to control Corrie's parenting of the child, which Deborah has done throughout the child's life.

[¶6] Two days after Corrie filed her motion to dismiss Deborah's petition, the court granted the motion. The court's order set out the factual findings described above.[2] The court then analyzed the information in the parties' affidavits in terms of the legal standards governing de facto parenthood cases, *see* 19-A M.R.S. § 1891(2), (3) (2017), and found that Deborah had not provided

---

[2] With respect to the boyfriend, the court found that Corrie has addressed any concerns by—among other things—maintaining continuous contact with the boyfriend's probation officer and therapist, and by complying with restrictions they imposed.

"consistent caretaking" of the child; that Corrie had not "understood, acknowledged or accepted that or behaved as though [Deborah] is a parent of the child"; and that Deborah had not "accepted full and permanent responsibilities as a parent of [the child]," *id.* § 1891(3)(B)-(D). On that basis, the court concluded that Deborah had not established standing because she failed to make a "prima facie showing of de facto parentage as required . . . under the Grandparents Visitation Act" to proceed on her petition. (Italics omitted.)

[¶7] Deborah filed a "Motion to Reconsider/or for Hearing" in which she asserted that her relationship with the child rises to the level of a de facto parent and is "substantially greater than that of a normal and involved grandparent."[3] Deborah also filed another affidavit, in which she requested that the court hold an evidentiary hearing where she would present the testimony

---

[3] As another ground stated in the motion and argued on appeal, Deborah contends that she was not given the twenty-one days allowed by rule to respond to Corrie's motion to dismiss. *See* M.R. Civ. P. 7(c)(2). Even if the court acted on Corrie's motion prematurely, that error is of no moment because the court issued another order after fully considering the additional argument and factual assertions that Deborah submitted in her motion for reconsideration. If anything, that process gave Deborah a particular advantage because, in the end, she was able to respond with knowledge of the deficiencies in her standing presentation that the court described in its initial order. *See* M.R. Civ. P. 61 (harmless error standard).

In fact, the court acted with commendable expediency in acting on Corrie's motion to dismiss. Because of the disruptive effect of a third-party proceeding on a parent-child relationship, *see, e.g.*, *Rideout v. Riendeau*, 2000 ME 198, ¶¶ 29-32, 761 A.2d 291, speedy resolution is of importance to the parties and, even more so, to the child who may be affected by the case. Here, the court acted with dispatch but in a way that allowed Deborah to be fully and fairly heard.

of third-party witnesses "who would verify [her] role as a de facto parent to [the child]."[4]  In the affidavit, Deborah stated, among other things, that she had encouraged Corrie to enroll the child in daycare so that Corrie would be financially responsible for the child and the child would have interaction with others of his age; that Corrie "broke off communication" between Deborah and the child, but Deborah continued to see the child at activities where Corrie was also present and therefore knew that Deborah was present; that Corrie provided Deborah's contact information to third parties to be used in an emergency; and that Corrie has consulted Deborah on parenting issues.

[¶8]  The court denied Deborah's motion, concluding that, even with the additional submissions, *see supra* n.3, she had not demonstrated standing and that a hearing was unnecessary because the body of facts set forth in her various affidavits "fail to establish the elements of de facto parenthood required under Maine law."  Deborah timely appealed to us.  *See* 14 M.R.S. § 1901(1) (2017); 19-A M.R.S. § 104 (2017); M.R. App. P. 2(b)(3) (Tower 2016).[5]

---

[4]  Elsewhere in the motion, and contrary to one form of relief she requested in her petition, Deborah stated that she was *not* seeking primary physical residence of the child but rather specific rights of contact.

[5]  The restyled Maine Rules of Appellate Procedure do not apply because this appeal was filed before September 1, 2017.  *See* M.R. App. P. 1 (restyled Rules).

## II. DISCUSSION

[¶9]  Deborah argues on appeal that the court erred by dismissing her petition based on its determination that she failed to establish standing. Deborah's petition stated that it was predicated on the GVA, but, as we have noted above, *see supra* ¶¶ 4, 7, her submissions to the court also introduced concepts that are specific to the law of de facto parenthood.[6]  The court made its standing determination pursuant to the de facto parentage framework prescribed in the Maine Parentage Act (MPA), *see* 19-A M.R.S. § 1891(3).  We conclude that, as a matter of law, when the substance of Deborah's petition is viewed solely as one to establish rights pursuant to the GVA itself, the evidence in the record is insufficient to demonstrate that Deborah has standing.  Further, to the extent that Deborah's claim is viewed as one to establish de facto parenthood, she has not demonstrated standing not only because—as the court concluded—the information in the record did not satisfy all of the statutory standing elements, but also because her failure to demonstrate standing

---

[6]  These include the assertion in the originating petition that she was seeking primary physical residence of the child—something that goes well beyond "reasonable rights of visitation or access" that are available in a GVA proceeding, *see* 19-A M.R.S. § 1803 (2017)—and explicit statements of de facto parenthood in later submissions.

pursuant to the GVA necessarily means that she cannot meet the greater standing requirements governing de facto parenthood cases.

[¶10]  We examine the legal aspects of a court's standing determination de novo and review for clear error the factual findings underlying that determination.  *See* 19-A M.R.S. §§ 1803(2), 1891(2); *Philbrook*, 2008 ME 152, ¶ 21, 957 A.2d 74 (citing *Bissias v. Koulovatos*, 2000 ME 189, ¶ 6, 761 A.2d 47 (stating that the issue of standing presents a mixed question of law and fact, where the "underlying historical facts" on which a court "based its finding of standing are reviewed for clear error" and legal questions are reviewed de novo)); *see also Desmond v. Desmond*, 2011 ME 57, ¶ 5, 17 A.3d 1234 (stating that where "there was no request for findings following the court's entry of its judgment, we infer any findings necessary to support the result . . . as long as those findings are supported by the record" (citing M.R. Civ. P. 52)).

A.    Standing Principles in GVA and De Facto Parenthood Cases

[¶11]  In its judgment, the court equated the standing requirements in a GVA proceeding with those applicable to a de facto parenthood case.  As we explain below, however, there can be a material difference between the two. Accordingly, before addressing how those standards apply to Deborah's

petition, we consider the relationship between the statutory principles of standing in GVA and de facto parenthood proceedings.

[¶12]  A third party's action to establish rights regarding someone else's child interferes with the parent's fundamental right to raise that child and decide with whom, and under what circumstances, the child may have contact. *See Rideout v. Riendeau*, 2000 ME 198, ¶ 30, 761 A.2d 291; *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) (stating that "the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests"); *Curtis v. Medeiros*, 2016 ME 180, ¶ 13, 152 A.3d 605; *Eaton v. Paradis*, 2014 ME 61, ¶ 8, 91 A.3d 590.  Consequently, whether a grandparent seeks to establish rights of contact with a grandchild pursuant to the GVA, or a third party—who *could* be a grandparent, *see, e.g.*, *Philbrook*, 2008 ME 152, ¶ 7, 957 A.2d 74—seeks an adjudication of de facto parenthood, that petitioner must prove that he or she has standing to proceed to a plenary hearing on the requested relief.  This common requirement is well-established both in our

decisional authority[7] and in statute,[8] and constitutes a safeguard designed to prevent unjustified interference with the fundamental rights inherent in a parent-child relationship, while also allowing an adjudication of any legitimate interests of third parties that would affect that relationship. *See Eaton*, 2014 ME 61, ¶ 8, 91 A.3d 590 (discussing the purpose of the standing requirement in de facto parenthood cases); *Rideout*, 2000 ME 198, ¶¶ 30-32, 761 A.2d 291 (discussing the purpose of the standing requirement in GVA cases). We review in turn the elements of standing necessary to proceed to a plenary hearing in de facto parenthood and GVA cases.

[¶13] To establish standing to proceed in a de facto parenthood case, the petitioner must prove, by a preponderance of the evidence, *see Davis v. McGuire*, 2018 ME 72, ¶¶ 19, 26, --- A.3d ---, the same elements that the petitioner ultimately would be required to prove by clear and convincing evidence at a

---

[7] *Compare Dorr v. Woodard*, 2016 ME 79, ¶ 14, 140 A.3d 467 (stating that pursuant to statute in a GVA case, standing must be satisfied "before litigation may commence"), *and Robichaud v. Pariseau*, 2003 ME 54, ¶ 8, 820 A.2d 1212 (characterizing the GVA standing requirement as "the first safeguard" against unduly burdening parents' fundamental rights), *with Philbrook v. Theriault*, 2008 ME 152, ¶ 19, 957 A.2d 74 (stating that on a petition for de facto parenthood, the petitioner must satisfy the standing requirement "before a parent can be required to fully litigate the issue"), *and Davis v. Anderson*, 2008 ME 125, ¶ 17, 953 A.2d 1166 (same).

[8] *Compare* 19-A M.R.S. § 1803(1), (2) (GVA), *with* 19-A M.R.S. § 1891(2) (2017) (de facto parentage).

plenary hearing for a determination of de facto parenthood status, *see*

19-A M.R.S. § 1891(2)(C), (3).  Those elements comprise the following:

> A. The person has resided with the child for a significant period of time;
>
> B. The person has engaged in consistent caretaking of the child;
>
> C. A bonded and dependent relationship has been established between the child and the person, the relationship was fostered or supported by another parent of the child and the person and the other parent have understood, acknowledged or accepted that or behaved as though the person is a parent of the child;
>
> D. The person has accepted full and permanent responsibilities as a parent of the child without expectation of financial compensation; and
>
> E. The continuing relationship between the person and the child is in the best interest of the child.

*Id.* § 1891(3).  These are the features that, when viewed collectively, the

Legislature has determined to constitute the essence of a de facto parent-child

relationship—namely, that the putative de facto parent "has fully and

completely undertaken a permanent, unequivocal, committed and responsible

parental role in the child's life."[9]  *Id.*

---

[9] In a recent opinion, we noted the differences between the elements of de facto parentage articulated in 19-A M.R.S. § 1891 (2017) and in our case law that predated the enactment of that statute.  *See Davis v. McGuire*, 2018 ME 72, ¶ 15 n.7, --- A.3d ---.  In this case, as was true in *Davis*, we need not determine whether those statutory elements are a constitutionally sufficient basis for the

[¶14]  In contrast to the standing requirement in a de facto parenthood case, a grandparent who brings a claim pursuant to the GVA must demonstrate standing by showing either a "sufficient existing relationship" with the grandchild, or a "sufficient effort to establish" a sufficient existing relationship with the grandchild.  19-A M.R.S. § 1803(1)(B), (C).[10]  The first of these two formulations, set out in section 1803(1)(B), is at issue here.  We have held that the "substantial relationship" criterion set out in section 1803(1)(B) can be applied constitutionally only when "the most *urgent reasons*" are present as the compelling state interest that is constitutionally required to justify governmental interference with the "natural right of a parent to the care and control of a child."  *Rideout*, 2000 ME 198, ¶ 24, 761 A.2d 291 (quotation marks omitted); *see also Robichaud v. Pariseau*, 2003 ME 54, ¶ 8, 820 A.2d 1212.

---

state to interfere with the parental rights of Corrie—a fit parent—because Deborah has not satisfied even the statutory elements of standing to pursue a de facto parenthood claim.

[10]  Although not applicable in this case, section 1803(1) continues to state that a grandparent also may acquire visitation rights with a grandchild in a third situation, namely, when at least one of the child's parents or legal guardians has died.  19-A M.R.S. § 1803(1)(A).  We have held, however, that the death of one parent is *not* a sufficiently compelling basis for a court to interfere with the surviving parent's rights to the child.  *Conlogue v. Conlogue*, 2006 ME 12, ¶¶ 18, 22, 890 A.2d 691.

We also note that if a grandparent meets the standing prerequisite pursuant to the GVA, then at the resulting plenary hearing a court will be called upon to determine if the grandparent's "reasonable rights of visitation or access" to the child is in the child's best interest and whether any visitation or access would not "significantly interfere with any parent-child relationship or with the parent's rightful authority over the child." 19-A M.R.S. § 1803(3).  This means that, unlike in a de facto parenthood case, there is a lack of symmetry between the elements of standing to proceed with a GVA petition and the elements of proof at a plenary hearing.  *Compare* 19-A M.R.S. § 1803(1), (3), *with id.* § 1891(2), (3).

[¶15] In a GVA case, the "urgent reason" that must be present to establish standing *includes* a situation where "a grandparent who has functioned as a parent to the child seeks continued contact with that child"—in other words, "[w]hen a grandparent has been the primary caregiver and custodian for a child over a significant period of time." *Rideout*, 2000 ME 198, ¶¶ 25, 27, 761 A.2d 291 (quotation marks omitted); *see also Conlogue v. Conlogue*, 2006 ME 12, ¶ 10, 890 A.2d 691; *Robichaud*, 2003 ME 54, ¶ 10, 820 A.2d 1212 (stating that "*Rideout*'s 'urgent reasons' standard presupposes extraordinary contact between a grandparent and grandchildren to satisfy the constitutional requirement of a compelling state interest to interfere with parents' right to care for and control their children"). Conversely, where a grandparent's contact with the grandchild is not extraordinary but rather is "intermittent," the grandparent does not have standing to proceed with a GVA petition. *Robichaud*, 2003 ME 54, ¶ 10, 820 A.2d 1212; *see also* 19-A M.R.S. § 1803(1).

[¶16] We have not, however, restricted the "urgent reasons" necessary to satisfy standing in a GVA case to the circumstance described in *Rideout*, where the petitioning grandparent had what amounted to a de facto parent relationship with the grandchild. *Rideout*, 2000 ME 198, ¶¶ 4-5, 24-26, 761 A.2d 291. Rather, such a relationship is "*[o]ne* such urgent reason" that

warranted protection for the grandchildren's benefit. *Conlogue*, 2006 ME 12, ¶ 10, 890 A.2d 691 (emphasis added); *see also Dorr v. Woodard*, 2016 ME 79, ¶ 17, 140 A.3d 467 ("To date, the only 'urgent reason' that we have articulated for the intrusion upon a fit parent's rights and grant of court-ordered visitation is the child's need for continued contact with a grandparent who has been a primary caregiver and custodian for a significant part of the child's life."); *Davis v. Anderson*, 2008 ME 125, ¶ 15, 953 A.2d 1166 (stating that "urgent reasons exist when grandparents have acted as de facto parents. No other urgent reasons have yet been identified." (citation omitted)).

[¶17]    Therefore, in an action brought under the GVA, when a grandparent attempts to establish standing to pursue a claim for rights of visitation with or access to the child through evidence of a de facto parent relationship, then—contrary to the court's reasoning here—that standing will rest not on the proof that would be required in a de facto parenthood case itself, but rather on proof of standing as prescribed in the GVA, namely, the existence of a "sufficient existing relationship" that rises to the level of an "urgent reason" as we have explained that principle.[11] If, however, a petitioner who happens to

---

[11] Whatever may be the "urgent reason" that is essential to satisfy standing, it is determined by looking to the child's needs, not those of a petitioner. *See Dorr*, 2016 ME 79, ¶ 17, 140 A.3d 467; *see also Rideout*, 2000 ME 198, ¶ 26, 761 A.2d 291 ("The cessation of contact with a grandparent whom

be a grandparent seeks to be adjudicated as a de facto parent, then the petitioner will be required to prove standing pursuant to de facto parenthood principles.

[¶18] While the differences between the standing requirements in GVA and de facto parenthood proceedings are now a function of statute, we previously described the reason why those differences exist. In a GVA proceeding, a court may award the limited rights of visitation or access, but only to the extent that the award does not "significantly interfere with any parent-child relationship or with the parent's rightful authority over the child."

---

*the child views* as a parent may have a dramatic, and even traumatic, effect upon the child's well-being." (emphasis added)). We have made clear, however, that while the focus of the analysis is on the child, the child's best interest—by itself—is not a sufficiently urgent reason that constitutionally satisfies the GVA standing requirement. *See Dorr*, 2016 ME 79, ¶ 17, 140 A.3d 467; *Davis*, 2008 ME 125, ¶ 13, 953 A.2d 1166; *Conlogue*, 2006 ME 12, ¶ 17, 890 A.2d 691; *Rideout*, 2000 ME 198, ¶ 12, 761 A.2d 291.

Further, although we have left open the prospect that a grandparent may establish standing to pursue visitation rights pursuant to the GVA with proof of some "urgent reason" other than de facto parenthood, our discussions make clear that any such opening is narrow. *See, e.g., Dorr*, 2016 ME 79, ¶¶ 16-17, 140 A.3d 467. We have cautioned that

> it will be difficult for a grandparent to demonstrate a compelling state interest sufficient to infringe on a fit parent's fundamental right when there is no threat of harm to the child.
>
> . . . .
>
> Ultimately, the relationship that a grandparent has with his or her grandchild is a decision to be made by a fit parent, not the courts, unless the record presents a compelling reason for the State to intervene.

*Id.* ¶¶ 16, 28.

19-A M.R.S. § 1803(3). This contrasts with de facto parenthood proceedings, as well as child protection and guardianship cases, where there is the prospect of a much more profound disruption of a parent's relationship with his or her child because the full panoply of parental rights and responsibilities can be awarded to third persons, thereby requiring a stronger justification to allow the case to progress to a plenary hearing. *See Pitts v. Moore*, 2014 ME 59, ¶ 16, 90 A.3d 1169 (quoting 19-A M.R.S. § 1803(3)). Therefore, not only do the elemental standing requirements differ in the two types of proceedings, but the overall principle and nature of standing in a de facto parenthood case must be seen conceptually as more substantial than in GVA cases in order to justify the deeper level of governmental intrusion into a parent's constitutionally protected interests.

[¶19] Against this legal backdrop, we now consider the sufficiency of evidence of Deborah's standing to pursue rights pursuant to the GVA and as a de facto parent.

B.    Sufficiency of Evidence of Deborah's Standing

[¶20] As we have noted, Deborah commenced this action pursuant to the GVA but also raised the specter of de facto parenthood, and the court's analysis centered on the standing requirements imposed in a de facto parenthood case.

Therefore, we review Deborah's petition both as a claim pursuant to the GVA and one seeking de facto parenthood. We first conclude that Deborah has not established, as a matter of law, that she has standing to pursue a GVA claim. And beyond that, she has failed to demonstrate standing for a de facto parenthood claim both because, as the court correctly concluded, the record does not satisfy all of the statutory elements, and also because her failure to meet the lower threshold of GVA standing necessarily means that she cannot meet the greater standard imposed in de facto parenthood claims. We address Deborah's claim of standing in both contexts.

[¶21] Preliminarily, we note that in its order, the court examined Deborah's factual assertions that were most supportive of her claim. With one exception relating to Corrie's boyfriend, discussed *infra* ¶ 24, the court did so by accepting those assertions as true, which is an evidentiary standard that was more generous than that to which Deborah was actually entitled. The GVA specifically provides that the court shall make its standing determination based on facts *found* by the court. *See* 19-A M.R.S. § 1803(2)(C) ("The court shall determine on the basis of the petition and the affidavit *whether it is more likely than not* that there is a sufficient existing relationship or, if a sufficient relationship does not exist, that a sufficient effort to establish one has been

made." (emphasis added)). Similarly, as we stated in an opinion published after the court issued its judgment, when attempting to demonstrate standing in a de facto parenthood case, the petitioner is subject to a burden of persuasion and not merely one of production. *See Davis*, 2018 ME 72, ¶¶ 19, 25-26, --- A.3d ---. Even when the record is viewed as the court did, Deborah has not demonstrated standing to become entitled to a plenary hearing for GVA rights or de facto parenthood, which we address in turn.

1. GVA Standing

[¶22] In her submissions, Deborah stated that Corrie and the child lived at Deborah's residence until the child turned two years old, which was at the end of 2010. Corrie and the child then moved into a separate residence. From that time until Corrie chose to limit Deborah's contact with the child starting approximately in March of 2017, Deborah's contact with the child largely occurred one day per week after school and during most weekends, and by means of electronic communication, except for a unique circumstance in early 2017, shortly after Deborah's husband died, when Corrie and the child stayed at Deborah's residence for approximately three weeks. Notably, as Deborah acknowledged in her affidavits, she provided limited care for the child, and the child remained enrolled in daycare and, later, in afterschool care. In short,

although Deborah's contact with the child was on a somewhat predictable basis, that contact was nonetheless intermittent. As we have held, intermittent contact with a child is not an urgent reason that would allow a court to grant visitation rights to a grandparent. *See Robichaud*, 2003 ME 54, ¶ 10, 820 A.2d 1212.

[¶23] In addition to the contact Deborah described, she asserted that Corrie had listed Deborah as the child's emergency contact and that Corrie consulted with her about parenting issues. These extrinsic forms of Deborah's involvement in the child's life are typical of a grandparent's support for a grandchild and cannot be seen to rise to the level of urgency necessary to allow the court to consider intruding into Corrie's constitutionally protected relationship with the child. *See, e.g.*, *Katon v. Brandi M.*, 2011 ME 131, ¶¶ 2-3, 32 A.3d 1047 (affirming the dismissal of a GVA petition for lack of standing on the basis that the contact averred was "typical for a grandparent and not extraordinary").

[¶24] As noted above, the one contested aspect of the evidence where the court did make findings relates to Corrie's boyfriend, who is a convicted sex offender. In her affidavit, Deborah expressed concern about the child's safety in his presence. In a responsive affidavit, however, Corrie provided detailed

information about her interaction with the boyfriend's probation officer and therapist to determine if the child was at risk, the probation officer's approval of contact between the boyfriend and the child, and the probation officer's contact with the Department of Health and Human Services at her request so that that agency is fully aware of the child's circumstances. Based on the information provided in these competing affidavits, the court found that Corrie had addressed Deborah's concerns. The court was entitled to make findings of this type, and the finding is supported by the evidence. *See Philbrook*, 2008 ME 152, ¶ 21, 957 A.2d 74. In one of her affidavits, Deborah expressly asserted that the presence of the boyfriend in the child's life was one of the two specific circumstances that, she claimed, entitled her to rights to the child even over the mother's objection.[12] Pursuant to the court's findings, her concern is not substantiated and cannot rise to the level of an urgent reason.

[¶25] For purposes of the GVA standing analysis, Deborah therefore has not demonstrated the existence of a substantial existing relationship that constitutes an "urgent reason," as we have explained that concept, *see, e.g., Dorr*,

---

[12] The second circumstance as alleged by Deborah was the interruption of her contact with the grandchild, which, as we discuss in the text, was not of a magnitude that would support creation of rights pursuant to the GVA. *See supra* ¶¶ 4, 22-23.

2016 ME 79, ¶¶ 16-17, 140 A.3d 467, necessary to justify governmental intrusion in Corrie's relationship with her child.

2.     De Facto Parenthood Standing

[¶26]  When Deborah's petition is seen as seeking an adjudication of de facto parenthood, the court correctly concluded that her relationship with the child fell materially short of the exacting standards necessary for a third person to be determined as a child's parent.  Our review of the record developed by the parties does not reveal triable contentions that Deborah engaged in consistent caretaking of the child, that Corrie accepted or acknowledged Deborah as a co-parent of the child, or that Deborah accepted "full and permanent responsibilities" as the child's parent.  *See* 19-A M.R.S. § 1891(3)(B)-(D).  These are requisite elements of a claim to become a judicially recognized de facto parent and are therefore also elements of standing necessary to pursue that claim. *See id.* § 1891(2)(C). Because Deborah failed to present evidence of these elements—much less establish them by a preponderance of the evidence, *see Davis*, 2018 ME 72, ¶¶ 19, 25-26, --- A.3d ----she has not demonstrated standing to proceed to a plenary hearing.

[¶27]  Further, by logical force, because Deborah has not satisfied the standing requirements for her GVA petition to obtain the less-intrusive

visitation and access rights to the child over a fit parent's objection, Deborah cannot satisfy the more rigorous standing requirement imposed by the MPA— namely, that she has "fully and completely undertaken a permanent, unequivocal, committed and responsible parental role in the child's life"—to warrant intrusion in Corrie's fundamental right to parent and raise her child. *See* 19-A M.R.S. § 1891(3).

## III. CONCLUSION

[¶28]   Because Deborah did not establish standing to proceed to a plenary hearing on her petition pursuant to the GVA or the more stringent statutory requirements of a de facto parenthood claim, we affirm the judgment dismissing her petition.

The entry is:

Judgment affirmed.

---

JABAR, J., dissenting.

[¶29]  I respectfully dissent because the trial court used the wrong legal standard to determine whether Deborah established standing under the Grandparents Visitation Act (GVA), 19-A M.R.S. §§ 1801-1805 (2017).  The trial court's decision hinged upon whether Deborah established standing as a

de facto parent to the child. This is not the proper test to be applied by the trial court in order to determine standing in a GVA case. Because it was the trial court that mistakenly introduced the issue of de facto parenthood, our review must focus on whether Deborah has established standing pursuant to the GVA and not pursuant to the principles of de facto parenthood.

A.    The Trial Court's Application of the Wrong Standard

[¶30]  Although Deborah's cause of action was for contact pursuant to the GVA, the Court's opinion repeatedly refers to Deborah's attempts to establish standing by proving that she was a de facto parent. Court's Opinion ¶¶ 1, 4, 7, 9, 20. For example, the Court refers to Deborah as "a putative de facto parent" to the child, states that Deborah's "submissions to the court . . . introduced concepts that are specific to the law of de facto parenthood," and asserts that even though "Deborah commenced this action pursuant to the GVA," she "raised the specter of de facto parenthood." Court's Opinion ¶¶ 1, 9, 20. The Court also references the language at the very end of Deborah's petition—that she was seeking "primary physical residence" of the child—as support that she was seeking a de facto parenthood adjudication, and yet in footnote four, the Court acknowledges that Deborah was *not* seeking primary physical residence of the child. Court's Opinion ¶¶ 4, 7 n.4.

[¶31]   The record, however, does not support these assertions by the Court.  Because a trial court's decision on standing is based on the pleadings without a hearing, *see* 19-A M.R.S. § 1803(2)(C) (2017), we must look to the documents that were presented to the trial court prior to its decision.  In Deborah's petition for contact pursuant to the GVA and her accompanying affidavit, there is no reference whatsoever to the term de facto parentage or the Maine Parentage Act.  *See* 19-A M.R.S. § 1891 (2017).  In response to Deborah's GVA petition, Corrie filed a motion to dismiss with an accompanying affidavit.  In this responsive pleading, which incorporated a memorandum of law, there is also no reference to the term de facto parentage.  The memorandum of law cites and analogizes to our case *Robichaud v. Pariseau*, 2003 ME 54, 820 A.2d 1212, which is a GVA case that does not involve de facto parentage issues.

[¶32]  Without any further documents presented to the court by Deborah or Corrie, the trial court for the first time mistakenly referenced de facto parentage when it concluded that Deborah had failed to make a prima facie showing that she was a de facto parent to the child and that she therefore lacked standing to proceed.  In its order dismissing Deborah's petition for visitation, the trial court concluded that

Petitioner has not shown de facto parent status, and thus cannot constitutionally pursue visitation rights under the Grandparents Visitation Act.

Accordingly . . . the court declines to find that she has made a *prima facie* showing of de facto parentage as required for her to establish standing under the Grandparents Visitation Act.

[¶33] In response to the court's order, Deborah filed a motion for reconsideration and requested an alteration of the court's decision, and it was at that point, for the first time, that Deborah referred to de facto parentage and the legal precedents cited by the trial court in its order. It is obvious that she was trying to bring the facts of her case under the umbrella of de facto parentage as a result of the trial court's improper application of that standard. It is wholly inaccurate to imply, in any way, that Deborah's case strategy was the reason the trial court incorrectly applied the de facto parentage standard to determine whether Deborah had standing to proceed. Of its own volition, the trial court steered this case onto a side track dealing with de facto parentage where it did not belong; it is a mistake for us to continue down that track.

[¶34] Although Deborah's post-judgment motion filed in the trial court and her brief on appeal construe her arguments in terms of de facto parentage, that legal strategy is the logical outgrowth of the trial court's erroneous application of the de facto parentage framework to Deborah's initial GVA

petition. I must reiterate that upon the GVA petition and the responsive pleading, neither Corrie nor Deborah ever mentioned de facto parentage, and it is entirely unnecessary for this Court, upon appellate review, to consider Deborah's arguments regarding de facto parentage—which she advanced only after the court improperly introduced this concept into the case—as the precursor to her GVA petition.

[¶35] In the end, it should not make any difference who raised the issue of de facto parentage—the trial court used the wrong legal standard when it failed to assess standing in this case pursuant to a GVA analysis. Because this is a GVA case, and not a de facto parenthood case, the statutory requirements for standing pursuant to the GVA should be the only issue that we consider in our review.

B. The Proper Standard and its Application to this Case

[¶36] In 1991, the Legislature first enacted the Grandparents Visitation Act.[13] *See* P.L. 1991, ch. 414 (effective Oct. 9, 1991) (codified at 19 M.R.S.A.

---

[13] In enacting the GVA, the Legislature demonstrated its belief that the maintenance of the relationship between the grandparent and the grandchild is in the best interest of the child in certain cases, and that that relationship is something of value from the child's perspective. *See* L.D. 1307, Statement of Fact (115th Legis. 1991) ("All children are entitled to enjoy secure, stable and beneficial relationships with their grandparents and to maintain these relationships . . . . The bill allows the court to maintain the relationship between a grandchild and that grandchild's grandparents when it is in the grandchild's best interest and does not interfere with a parent-child relationship.").

§§ 1001-1005 (Supp. 1991)). Our opinions construing the GVA have effectively made it impossible for grandparents to establish standing. *See Dorr v. Woodard*, 2016 ME 79, ¶¶ 29-43, 140 A.3d 467 (Jabar, J., dissenting) (discussing the demise of each possible avenue to establish standing pursuant to the GVA). Regardless, I believe that the GVA—which has neither been repealed by the Legislature nor held facially unconstitutional by this Court—and its statutory requirements should control our analysis.

[¶37]  In *Robichaud*, the leading case cited by Corrie in her motion to dismiss, we interpreted the GVA, without reference to de facto parenthood, as requiring three safeguards against the intrusion into a parent's fundamental rights:

> The safeguards include that: (1) a grandparent must establish standing *before* litigation may commence on a petition, (2) the court must consider any objection of the parents concerning an award of rights of visitation or access by the grandparents (giving life to the presumption that parents act in the best interests of their children), and (3) the court may not grant visitation if doing so would significantly interfere with any parent-child relationship or with the parent's rightful authority over the child.

2003 ME 54, ¶ 8 n.2, 820 A.2d 1212 (quotation marks omitted).  The first safeguard, and the only one relevant to this case at this stage, is that the grandparent must establish standing before litigation may commence. *See id.*; *see also* 19-A M.R.S. § 1803(1)(A)-(C).  Pursuant to section 1803(1)(B), a

grandparent may petition the court for reasonable rights of visitation or access if "a sufficient existing relationship" exists "between the grandparent and the child."  In *Robichaud*, we held that in order to comply with the constitutional protections afforded parents, grandparents must establish that "urgent reasons" exist.  2003 ME 54, ¶¶ 7, 10, 820 A.2d 1212.  Implicit within the test set forth in *Robichaud* was the concept that the "urgent reasons standard presupposes extraordinary contact between a grandparent and grandchildren to satisfy the constitutional requirement of a compelling state interest to interfere with parents' right to care for and control their children."  *Id.* ¶ 10 (quotation marks omitted).

[¶38]  Although the test set out in *Robichaud* does not require any finding of de facto parenthood, some of our cases following *Robichaud* have led to confusion regarding the intersection of the law governing de facto parentage and grandparent visitation.[14]  In some of those cases, we have held that the establishment of de facto parentage status meets the "extraordinary contact" test set forth in *Robichaud*, *see, e.g.*, *Davis v. Anderson*, 2008 ME 125, ¶ 19, 953 A.2d 1166; *Dorr*, 2016 ME 79, ¶ 17, 140 A.3d 467, but just because the

---

[14]  Although the Court's opinion gives a thorough explanation of de facto parenthood, it is unnecessary and, more importantly, it adds to the confusion that this line of cases has created.  Other than holding that the trial court erred by using the standard for de facto parenthood in a GVA case, there is no need to discuss de facto parenthood.

establishment of de facto parentage will satisfy the "extraordinary contact" test does not mean that the de facto parentage test is the proper test to apply when evaluating a case brought pursuant to the GVA. In order to gain standing pursuant to a de facto parentage claim, the petitioner must meet a much higher bar than the petitioner must meet pursuant to the GVA.

[¶39] In *Dorr v. Woodard* and *Davis v. Anderson*, for example, we clearly indicated that there may be other cases that fall short of the stringent requirements of de facto parentage but nevertheless may still pass the "urgent reasons" or "extraordinary contact" test of *Robichaud*. In *Dorr*, we stated that "[t]o date, the only urgent reason that we have articulated" is the test for de facto parentage, but "*[i]t is possible* that in some circumstances, a grandparent's sufficient effort to establish a relationship with her grandchild could pass constitutional muster and demonstrate urgent reasons . . . . However, we are not called upon here to define all instances where a compelling interest could be demonstrated." 2016 ME 79, ¶¶ 17, 24, 140 A.3d 467 (emphasis added) (quotation marks omitted). In *Anderson*, we stated that aside from de facto parentage, "[n]o other urgent reasons have *yet* been identified." 2008 ME 125, ¶ 15, 953 A.2d 1166 (emphasis added).

[¶40]   Here, the pivotal issue is whether Deborah established "extraordinary contact" with her grandchild. *See Robichaud*, 2003 ME 54, ¶ 10, 820 A.2d 1212.  Using the de facto parentage test creates a much higher bar than necessary to establish standing in a GVA case.  Because this is a GVA case not involving any claim for de facto parenthood, and the trial court used the wrong legal standard, we should remand for the trial court to consider the pleadings using the proper "extraordinary contact" standard articulated in *Robichaud*.

[¶41]   Although the Court acknowledges that the trial court used the wrong legal standard to determine Deborah's standing, it does not remand the case to the trial court to determine standing using the proper standard.  Court's Opinion ¶ 9.  Rather, the Court, as a matter of law, concludes that Deborah has failed to establish standing under the GVA.  Court's Opinion ¶¶ 9, 21.  In this, I strongly disagree.  If we are to review the affidavits and the facts presented in the affidavits, then I believe that Deborah has established "extraordinary contact" with her grandchild such that she has standing to proceed on her petition.

[¶42]   At the outset, it is important to note that standing does not afford Deborah an entitlement to relief under the GVA—it only establishes that she

has had a close enough relationship with the child such that she is entitled to be heard regarding whether it is in the child's best interest that she have contact with the child. *See* 19-A M.R.S. § 1803(2)-(3). Once standing has been established, the trial court addresses the best interest of the child. *See id.* It is at that point in the proceeding that the trial court would consider the second and third safeguards enunciated in *Robichaud*:

> (2) the court must consider any objection of the parents concerning an award of rights of visitation or access by the grandparents (giving life to the presumption that parents act in the best interests of their children), and (3) the court may not grant visitation if doing so would significantly interfere with any parent-child relationship or with the parent's rightful authority over the child.

2003 ME 54, ¶ 8 n.2, 820 A.2d 1212 (quotation marks omitted). After consideration of these safeguards and the best interest standard, the trial court may conclude that the grandparents are not entitled to any contact or are entitled to only limited contact.[15] As to the standing issue, the focus is only on the relationship between the grandparent and the child.

[¶43] In *Robichaud*, we indicated that the focus is on the existing or historical contact between the grandparent and the child to determine whether

---

[15] The Court discusses Corrie's boyfriend in its opinion, *see* Court's Opinion ¶ 24, but that discussion is misplaced at our stage of appellate review because although it may be relevant to what is in the child's best interest, it is irrelevant to the issue of standing. The child's best interest is not before us today.

that contact is "extraordinary." 2003 ME 54, ¶ 10, 820 A.2d 1212. The grandmother in *Robichaud* described her contact as occasional visits with the grandchildren, with visits sometimes lasting one day to one week over about a three-year period. *Id.* ¶ 6. The trial court there found that the contact described typified the type of contact that "one would anticipate from a connected, extended family." *Id*. (quotation marks omitted). We agreed and concluded that this level of contact was "intermittent" and therefore did not show that the grandmother had had extraordinary contact with the grandchildren. *Id.* ¶ 10. Similarly, in *Dorr*, we decided that the facts—the grandmother attended a baby shower for the child, went to the hospital the evening that the child was born, and had some unspecified amount of contact with the child—did not establish a sufficient existing relationship to confer standing. 2016 ME 79, ¶¶ 4, 20, 140 A.3d 467.

[¶44] This case is very different. The relationship between Deborah and the child was anything but ordinary or intermittent. Unlike the grandmother in *Robichaud*, Deborah's contact was extraordinary and not typical. The following facts, which are not contested, are contained in the grandmother's affidavit: Corrie and the child lived with her, full time, for the first two years of the child's life. When Corrie moved out, she moved only a half-mile away, and Corrie and

the child had contact with the grandparents several days a week. Deborah had the child with her at least one day per week and most weekends for the first several years of the child's life. As soon as the child was old enough for daycare, Deborah had him two days per week while Corrie was at work, and Deborah saw him almost every weekend. When the child started school, she would meet him at the bus on Wednesdays and feed him dinner. Deborah spoke with the child on the phone and through other electronic media several days per week. This close relationship continued for eight years until December of 2016, when a conflict arose between Corrie and Deborah because of Corrie's boyfriend. Later, after the child's grandfather, Deborah's husband, died, Corrie and the child moved in with Deborah for almost a month. This contact between Deborah and her grandchild was regular, close, and intensive; it was far from "typical." *See* Court's Opinion ¶ 23; *Katon v. Brandi M.*, 2011 ME 131, ¶¶ 2-3, 32 A.3d 1047. In fact, it is the exact type of "secure, stable and beneficial" relationship that the Legislature intended to permit grandparents to preserve and maintain through its enactment of the GVA. *See supra* n.13.

[¶45] Although these facts would not entitle the grandmother to de facto parenthood status—a status she never requested—the grandmother's relationship with the child far exceeds that which is typical of a "connected,

extended family" and is exactly the kind of "sufficient existing relationship" the Legislature intended should give rise to grandparent standing to seek visitation. If called upon to make a conclusion from the facts contained in the affidavit—which would be unnecessary were we to remand so that the court could apply the proper legal standard—we should conclude that Deborah has established standing to proceed on her petition. Therefore, she should be entitled to make her case in court that some level of contact between her and the grandchild is in the child's best interest.

C.     Conclusion

[¶46]   We should remand for the trial court to apply the proper "extraordinary contact" standard enunciated in *Robichaud*. Alternatively, we should conclude as a matter of law that Deborah has demonstrated that she has had extraordinary contact with the child and therefore has a sufficient existing relationship to establish standing pursuant to section 1803 of the GVA such that she may proceed on the merits of her petition.

Kenneth I. Marass, Esq. (orally), Springvale, for appellant Deborah E. Lamkin

Peter E. Rodway, Esq. (orally), Rodway & Horodyski, P.A., Portland, for appellee Corrie L. Lamkin

Portland District Court docket number FM-2017-479
FOR CLERK REFERENCE ONLY